**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HAROLD E. HILL; MARGARET R.
McCRIGHT; WILLIAM F. McCRIGHT;
JOHN J. McQUEEN; RITA J.
MOSKOWITZ; BARBARA SANTEE;
OKLAHOMA RELIGIOUS
COALITION FOR REPRODUCTIVE
CHOICE EDUCATION FUND, INC.,

       Plaintiffs-Appellants,

v.

THOMAS E. KEMP, Chairman,
Oklahoma Tax Commission; JERRY
JOHNSON, Vice Chairman, Oklahoma
Tax Commission; CONNIE IRBY,
Secretary-Member, Oklahoma Tax
Commission; SCOTT MEACHAM,
Treasurer, Oklahoma State Treasury;
HOWARD H. HENDRICK, Director,
Oklahoma Department of Human
Services; BRAD HENRY, Governor of
the State of Oklahoma; W.A. DREW
EDMONDSON, Attorney General of the
State of Oklahoma,

       Defendants-Appellees.

No. 05-5160

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 04-CV-28-CVE-PJC)**

---

Suzanne M. Grosso (Molly S. Boast with her on the briefs), Debevoise & Plimpton,
LLP, New York, New York; Priscilla J. Smith and Sanford M. Cohen, Center for

Reproductive Rights, New York, New York; Martha M. Hardwick, Hardwick Law Office, Tulsa, Oklahoma, for Plaintiffs-Appellants.

Ernest H. Short, General Counsel (Douglas B. Allen and Cara S. Nicklas, Assistants General Counsel, with him on the brief), Oklahoma Tax Commission, Oklahoma City, Oklahoma, for Defendants-Appellees Thomas E. Kemp, Jerry Johnson, and Connie Irby.

Richard W. Freeman, Jr., Assistant General Counsel, Department of Human Services, Oklahoma City, Oklahoma,(Kevin L. McClure, Assistant Attorney General, Oklahoma City, Oklahoma, with him on the briefs), for Defendants-Appellees Howard H. Hendrick, Scott Meacham, Brad Henry, and W.A. "Drew" Edmondson.

---

Before **TYMKOVICH, EBEL,** and **GORSUCH,** Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Certain individuals who license and operate their cars in the State of Oklahoma (the "Motorists"), together with the Oklahoma Religious Coalition for Reproductive Choice Education Fund, Inc. ("ORC"), argue that Oklahoma's statutory scheme for specialty motor vehicle license plates is unconstitutional under the First and Fourteenth Amendments. In claims one through four of their amended complaint, the Motorists contend that Oklahoma's laws unlawfully discriminate against their views by permitting drivers to obtain license plates bearing the messages "Adoption Creates Families" and "Choose Life" under terms and conditions more favorable than those available to those who wish to have license plates bearing messages of support for abortion rights. In claims five and

-2-

six, ORC argues that Oklahoma uses proceeds from its specialty license plate program to fund groups involved in adoption-related activities but impermissibly refuses to fund ORC's own adoption-related efforts solely because of its separate and distinct advocacy in favor of abortion rights.

In response to defendants' Rule 12(b) motion to dismiss, the district court dismissed this case on jurisdictional grounds without reaching its merits. Specifically, the district court held that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, passed by Congress to address federal court interference with state revenue raising efforts, precluded it from hearing claims one through four; with respect to claims five and six, the court concluded that the Eleventh Amendment's guarantee of state immunity from suit in federal court prevented it from exercising review. While we agree with the district court that Congress, through the TIA, has deprived the federal courts of jurisdiction over claims one through four, we hold that the Eleventh Amendment does not preclude consideration of claims five and six on their merits. We thus remand this matter for further proceedings on those counts.

I

A

The Oklahoma Tax Commission ("Tax Commission") is charged with enforcing the State's Vehicle License and Registration Act ("the Registration Act"). Consistent with similar laws across the country, the Registration Act requires that every motor vehicle owner purchase a license plate and display it on

his or her car. But, as is also increasingly typical today, the law provides a process by which motorists can pay an additional amount to the Tax Commission to obtain specialty license plates conveying messages ranging from "Veterans of Foreign Wars" to "Round and Square Dancing." *See* 47 Okla. Stat. §§ 1135.2, 1135.3, 1135.5, 1135.6.

Pertinent for our purposes, the Oklahoma Legislature in 2002 and 2004 specifically authorized specialty plates bearing the phrases "Adoption Creates Families" and "Choose Life." 47 Okla. Stat. §§ 1135.5(B)(22) and (23); 2002 Okla. Sess. Laws, ch. 179 § 1 ("Choose Life" plates); 2004 Okla. Sess. Laws, ch. 504 § 14 ("Adoption Creates Families" plates).[1] These two plates were among approximately 110 specialty plates the Legislature specifically authorized for immediate issuance, albeit with the further instruction that, if fewer than 100 of any kind of plate was issued before a date certain, the Tax Commission could stop issuing that particular plate. 47 Okla. Stat. § 1135.5(A).

The "Adoption Creates Families" and "Choose Life" plates both cost $35 in addition to normal licensing charges. 47 Okla. Stat. § 1135.5(C). For the "Adoption Creates Families" plate, $8 of the $35 charge goes to the Tax Commission Reimbursement Fund for the administration of the Registration Act,

_____

[1] Special license plates demonstrating support for adoption originally issued in 2001 with the phrase "Respect Life – Support Adoption." 2001 Okla. Sess. Laws, ch. 434 § 12. In 2004, the legislature recodified a portion of the special license plate program, and the adoption-support plates now bear the "Adoption Creates Families" phrase. 2004 Okla. Sess. Laws, ch. 504 §§ 14(B)(22), 22.

-4-

47 Okla. Stat. §§ 1135.5(C)(2); $25 goes to "a revolving fund established in the State Treasury for and to be used by the Department of Human Services [("DHS")] for the implementation of the Investing in Stronger Oklahoma Families Act specifically for created families,"[2] *id.* § 1135.5(B)(22); and the remaining $2 is apportioned among school districts, municipalities, and various other state funds, *id.* § 1135.5(C)(3).[3]

For the "Choose Life" plate, $8 is directed to the Tax Commission Reimbursement Fund to cover administrative costs associated with the Registration Act, 47 Okla. Stat. §§ 1135.5(C)(2); $20 goes to "a revolving fund [created in the State Treasury] for the Department of Human Services to be designated the Choose Life Assistance Program," *id.* § 1104.6(B); and the remaining $7 is apportioned among school districts, municipalities, and various other state funds, *see id.* § 1135.5(C)(3); *supra* at note 3. Monies in the Choose Life Assistance Program are disbursed by the State to non-profit organizations that "counsel[] pregnant women

---

[2] The Investing in Stronger Oklahoma Families Act was passed in order to "provide assistance to guardians of children, adoptive parents and other 'created families', to assist such guardians, adoptive parents and families to assume permanent custody of children in need of safe and permanent homes, and to enhance family preservation and the stability of these homes." 10 Okla. Stat. § 22.2(B). This law authorizes DHS to provide, *inter alia*, case management services, child care and after school care, transportation, and counseling for adoptive families. *Id.* § 22.2(H).

[3] The specific apportionment of these monies changes from year to year, but for illustrative purposes the money is directed roughly as follows: 36% to school districts according to a funding formula; 45% to the State's general revenue fund; 0.3% to the State Transportation Fund; 11% to the counties according to various funding formulas; about 3% to cities and towns; 1% to the Oklahoma Law Enforcement Retirement Fund; and 0.03% to the Wildlife Conservation Fund. 47 Okla. Stat. § 1104.

who are committed to placing their children for adoption." *Id.* § 1104.6(C)(3). By statute, however, organizations are ineligible to receive funds if they are "involved or associated with any abortion activities, including counseling for or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising." *Id.* § 1104.6(C)(4); *see also id.* § 1104.6(D) ("Funds may not be distributed to any organization that is involved or associated with abortion activities, including counseling for or referral to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising.").

While many license plates cost $35 and direct a portion of the funds to specific state programs associated with the message on the specialty plate, others cost less and do not direct money to specific initiatives. Thus, for example, a license plate expressing support for the Air Force Academy costs $15, $8 of which is directed to the Tax Commission to cover costs and the remainder of which is directed to school districts, municipalities, and other general state purposes. *See* 47 Okla. Stat. §§ 1135.3(B)(34), 1135.3(C); *supra* at note 3. Certain other license plates issued in recognition of past military service, current public service, and the like, are provided at $8 and funds derived from the sale of these plates are directed exclusively to the Tax Commission to cover administration costs. *Id.* §§ 1135.2(B)(1), (8) & 1135.2(C).

After plaintiffs initiated this lawsuit, the Oklahoma Legislature decided in 2005 to expand the number of specialty plates beyond the 110 or so it had already

enumerated. Effective January 1, 2006, the legislature authorized the Tax Commission to design and issue specialty plates demonstrating support for *any* organization, group, or cause so long as the message does not advertise or endorse a product, brand or service, does not promote prejudice, and is not contrary to state civil rights laws. *See* 47 Okla. Stat. § 1135.7. It is undisputed by the parties that the Motorists and ORC can use this new procedure to obtain license plates displaying their preferred messages, including ones voicing support for abortion rights. However, specialty plates issued under this new law may be issued only after the Tax Commission has received 500 prepaid applications for the particular specialty plate at issue. *Id.* § 1135.7(B)(4).

As with the plates previously authorized by the legislature, specialty plates issued under this new regime may also be designated by their sponsors to provide financial assistance to a state-sponsored initiative or program. Plates designed to provide such assistance cost $35, of which $8 goes to the Tax Commission Reimbursement Fund to defray the cost of the plates, $7 is apportioned among school districts, municipalities, and various state funds, *see id.* § 1135.7(D)(3); *supra* at note 3; and $20 is directed to "a state agency . . . responsible for expending the funds [according to the] specific public purpose" identified with the specialty plate at issue. *Id.* § 1135.7(E). Motorists and ORC do not dispute that they can design plates to provide funding for initiatives they support, including abortion rights. As with the preexisting statutory regime, specialty plates

authorized under Oklahoma's new statute that are not associated with a particular state fund or initiative cost $15, of which $8 goes to the Tax Commission Reimbursement Fund and $7 is apportioned among school districts, municipalities, and various state funds. *Id.* § 1135.7(C).

B

ORC is a non-profit organization that provides free services to pregnant women; these services include, *inter alia*, counseling about "all reproductive options" (including adoption and abortion), maintaining a "*Roe*" fund to help cover costs of abortion for indigent women, and sending its members to "stand as a non-confrontational and peaceful presence outside health facilities providing abortion services." (Am. Compl. ¶¶ 24, 26.) Motorists are Oklahoma residents identifying themselves as individuals who support "a woman's freedom to choose among all available reproductive options both before and after conception." (*Id.* ¶ 16.) In claims one through four of the amended complaint, the Motorist plaintiffs allege that Oklahoma's specialty license plates statutory scheme unconstitutionally discriminates against those who wish to show their support for "a woman's freedom to choose among all available reproductive options both before and after conception." (*Id.*) More specifically, they allege that those seeking a special license plate expressing support for abortion rights are not treated equally to those who apply for the "Choose Life" or "Adoption Creates Families" license plates. In claims five and six, ORC challenges the funding restrictions associated with the

Choose Life Assistance Program, arguing that the State's refusal to provide funds under this particular program to groups that express support for and engage in advocacy about abortion amounts to an "unconstitutional condition," requiring it to forego its protected First Amendment speech activities in order to qualify for governmental benefits.

As remedy, the Motorists seek injunctive relief and a declaratory judgment that Oklahoma's entire special license plate regime is unconstitutional,[4] while ORC seeks declaratory and injunctive relief preventing the State from enforcing provisions that condition a group's entitlement to receive funds under the Choose Life Assistance Program on a determination that the group is not "involved or associated with any abortion activities, including counseling for or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising." 47 Okla. Stat. § 1104.6(C)(4); *see also* § 1104.6(D).

Plaintiffs filed their suit on January 14, 2004, against various State officials – the Governor, State Attorney General, Treasurer, Director of the Department of Health and Human Services, and certain members of the Oklahoma Tax Commission. Without responding to the merits of plaintiffs' claims, defendants collectively moved to dismiss the case as a matter of law under Federal Rule of

_____

[4] Alternatively, Motorists seek relief affecting only the issuance of "Choose Life" and "Adoption Creates Families" plates. (Am. Compl. ¶¶ 164-65.) They do not challenge the "Physically Disabled" and "Hearing Impaired" license plates, 47 Okla. Stat. § 1135.1(B)(3) and (5), or plates on which motor vehicle owners are allowed to pick and choose their own numbers, letters or symbols, sometimes known as "personalized" or "vanity" plates, *id.* § 1135.4.

Civil Procedure 12(b).[5] In its ruling on that motion, the district court dismissed claims one through four on the ground that, through the TIA, Congress denied federal courts the power to hear lawsuits that seek to enjoin the levy or collection of state taxes, and that the collection of assessments associated with the specialty license plate program qualify as taxes under state law. The district court also dismissed claims five and six on the basis that the Eleventh Amendment immunizes defendants from suit in federal court. Finally, the district court held that the Governor and state Treasurer were so tangentially related to the issues in dispute that, whatever else the Eleventh Amendment may require, it commands their individual dismissal under *Ex parte Young*, 209 U.S. 123, 157 (1908) (requiring a plaintiff seeking an exception to Eleventh Amendment immunity to show, *inter alia*, that the state official defendants have "some connection with the enforcement of the act" in question).[6]

---

[5] Courts in at least two other circuits have reached the merits of similar claims, though their conclusions differ in significant respects. *Compare ACLU of Tenn. v. Bredesen*, 441 F.3d 370 (6th Cir. 2005) (holding that Tennessee's specialty licensing scheme, which included a "Choose Life" plate but not a "Pro-Choice" plate, did not violate plaintiff's First Amendment rights), *with Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004) (holding that South Carolina specialty licensing scheme authorizing a "Choose Life" plate without a pro-choice alternative did violate plaintiff's First Amendment rights). *See also Choose Life Ill., Inc. v. White*, No. 04 C 4316, 2007 WL 178455 (N.D. Ill. January 19, 2007) (following Fourth Circuit precedent and holding unconstitutional Illinois's refusal to issue "Choose Life" license plates).

[6] The district court's dismissal of these individuals is not challenged in this appeal.

II

A

Before assessing Motorists's appeal with respect to claims one through four, we must address defendants' assertion that this portion of the appeal is moot. *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1028 (10th Cir. 2003) ("[B]ecause questions of mootness go to our jurisdiction, we are required to address this issue at the outset."). Plaintiffs filed their initial complaint when Oklahoma had a finite list of approximately 110 specialty plates, including the "Choose Life" plate, but no analog expressing support for abortion rights. Oklahoma's 2005 law changed all that, of course, permitting virtually any group to receive specialty plates voicing support for its cause. Defendants assert (and plaintiffs do not dispute) that Motorists are now free to apply for and receive a specialty plate demonstrating their support for abortion rights and even providing financial support to abortion-related programs. These changed circumstances, defendants argue, moot plaintiffs' complaint with respect to the licensing aspect of this case.

A legislature is, of course, free to amend its own laws at any time and thereby moot ongoing litigation. *Shawnee Tribe v. United States*, 423 F.3d 1204, 1216-17 (10th Cir. 2005). Indeed, it is undoubtedly a commendable thing when the people's representatives are able, through the legislative process, to defuse potentially needless constitutional litigation. But, if after passage of the new

legislation, a plaintiff still "retain[s] a legally cognizable interest in the outcome, the case is not moot," and we are not free to shirk the responsibility of deciding the remaining controversy before us. *Seneca-Cayuga Tribe*, 327 F.3d at 1028 (internal quotation marks and citation omitted); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

This is just such a situation. While the Oklahoma Legislature has taken a significant step in allowing groups of all viewpoints to obtain specialty plates, a non-trivial and arguably discriminatory burden remains on those associated with plaintiffs' point of view. Under Oklahoma's regime, those plates specifically authorized by name by the legislature – including the Choose Life and Adoption Creates Families (among a great many others) – were issued immediately, subject only to the caveat that the Tax Commission could discontinue any plate if fewer than 100 were issued before a prescribed date. 47 Okla. Stat. § 1135.5(A). By contrast, under the 2005 "all comers" statutory rubric, plates expressing support for other causes – including abortion rights – can be issued only if and when the Tax Commission receives 500 prepaid applications within 180 days after the particular plate is authorized. 47 Okla. Stat. § 1135.7(B)(4). Simply put, there remains a difference between how Oklahoma treats those who wish to obtain a Choose Life or Adoption Creates Families plate, on the one hand, and those who wish to obtain a license plate expressing support for abortion rights, on the other. The latter group has to come up with 500 prepaid applications within a specified time frame, while

-12-

the former group is presumptively grandfathered in. The difference may not be insurmountable or even particularly onerous, but neither does it diminish the fact that a difference arguably preferring one competing viewpoint over another remains embedded in Oklahoma law. Accordingly, we are unable to say definitively that claims one through four are moot.

B

This leaves us confronting directly the question whether, as the district court held and defendants maintain, the TIA precludes our jurisdiction with respect to these claims. In the TIA, Congress succinctly and sweepingly directed that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Defendants and the district court argue that the money paid to Oklahoma under the specialty licensing regime falls within the ambit of the statutory phrase "any tax under State law," while plaintiffs contended before the trial court and in briefing before us that the money collected is not a tax but a regulatory fee incident to the State's police powers rather than its taxing authority.

Our starting point is, as it must be, with the plain terms of the law Congress enacted. At the time the TIA was adopted, one contemporaneous dictionary defined the term "tax" as "[a]n enforced, usually proportional, contribution, esp. of money, levied on persons, income, land, commodities, etc., for the support of

-13-

government and for the public needs; sometimes, a charge, as for a thing." 3 *The New Century Dictionary of the English Language* 1949 (1927). Another dictionary defined "tax" as "[a] charge, esp. a pecuniary burden imposed by authority; specif., a charge or burden, usually pecuniary, laid upon persons or property for public purposes; a forced contribution of wealth to meet the public needs of a government." *Webster's New International Dictionary of the English Language* 2587 (2d ed. 1934). Under either definition, Oklahoma's regime involves taxes. Oklahoma here enforces a contribution of money levied on the distribution of a commodity that it asserts the exclusive power, by virtue of its sovereignty, to issue; likewise, it plainly imposes a charge for a thing. And through its statutory regime, the Oklahoma Legislature generates and distributes funds for a wide variety of public purposes.

Perhaps even more pointedly, Judge Cooley[7] long ago confronted the question how to distinguish between taxes and fees and even how to categorize assessments that appear to have characteristics of both. "Suppose a charge is imposed partly for revenue and partly for regulation," he asked, "Is it a tax or an exercise of the police power?" 1 Thomas M. Cooley, *The Law of Taxation* 98 (4th ed. 1924) (hereinafter "Cooley"). Cooley answered: "cases of this nature are to be

---

[7] The Supreme Court has continually cited to Cooley's taxation treatise, referring to him as a "text writer[] of high authority." *Parsons v. District of Columbia*, 170 U.S. 45, 55 (1898); *see also, e.g., Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 523-24 (1981) (citing Cooley on Taxation in interpreting TIA's "plain, speedy and efficient remedy" exception).

regarded as cases of taxation.  If revenue is the primary purpose, the imposition is a tax.  Only those cases where regulation is the primary purpose can be specially referred to the police power."  *Id.* at 99 (internal citations omitted); *see also id.* at 109-10 (noting that even fees – such as for recording and filing certificates of incorporation, for inspections, or for docketing legal filings – can be taxes "if the object is to provide general revenue rather than to compensate the officers [who perform the service at issue], and the amount of the fee has no relation to the value of the services. . . . In other words, a charge fixed by statute for the service to be performed by an officer, where the charge has no relation to the value of the services performed and where the amount collected eventually finds its way into the treasury of the branch of the government whose officer or officers collect the charge, is not a fee but a tax.").

We have no qualms finding in this case that the primary purpose of the special license plate scheme is revenue rather than regulation and thus that it qualifies as a tax under Judge Cooley's formulation.  Under Oklahoma's scheme, only $8 of each plate sold goes to the administration of the Registration Act; the remaining funds are collected to be disbursed for a variety of public purposes identified by the Legislature.  To be sure, for $35 plates much of the remaining money goes to specific state funds and policy objectives associated with the license plate in question (e.g., $20 in the case of the Choose Life plates and $25 in the case of the Adoption Creates Families plates).  But the entire community benefits from

this scheme as these funds are variously spread among a wide array of State initiatives – ranging from adoption and urban forestry programs to education, grants for organizations that provide dog or cat spaying and neutering services, and the Oklahoma National Guard, to name just a few. And, of course, a portion of the funds for both the $35 and $15 plates (those demonstrating support for or membership in an organization or cause but not providing financial support, such as the Benevolent Protective Order of Elks or the Parrothead Club, 47 Okla. Stat. §§ 1135.3(16) and (25)) is distributed widely to a variety of municipalities, school districts, and the like, that have no relationship whatsoever to the message on the license plate at issue.

Current definitions of "tax" lead us in the same direction. Black's Law Dictionary defines "tax" as a "monetary charge imposed by the government on persons, entities, transactions or property to yield public revenue. Most broadly, the term embraces all governmental impositions on the person, property, privileges, occupations, and enjoyments of the people, and includes duties, imposts, and excises." *Black's Law Dictionary* 1496 (8th ed. 2004). Oklahoma's special license plate regime surely involves monetary charges imposed by the government on a transaction to yield public revenue. The Oxford English Dictionary adds that "'[t]ax' is the most inclusive term for these contributions [to the support of government]. . . . In the U.S., 'tax' is more generally applied in ordinary language

-16-

to every federal, state, or local exaction of this kind." 17 *Oxford English Dictionary* 677 (2d ed. 1989).[8]

This plain language understanding of the phrase "any tax under State law" comports with our precedent. In *Marcus v. Kansas, Department of Revenue*, 170 F.3d 1305, 1312 (10th Cir. 1999), we held that "[t]he critical inquiry focuses on the purpose of the assessment and the ultimate use of funds." *Id.* at 1311. Faced in *Marcus* (as we are here) with an argument that the assessment at issue amounted to a regulatory "fee" incident to the State's police power rather than a "tax under State law," we identified several identifying characteristics of state taxes:

> [T]he classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to help defray an agency's regulatory expenses.

*Marcus*, 170 F.3d at 1311 (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1011 (5th Cir. 1998)). So we might say that a "classic tax" includes an income tax, imposed by the legislature to defray general state expenses (even though a portion may go to defray the administration of the income tax collection system), while a "classic fee" might be an entry charge

---

[8] *See also* Erwin Chemerinsky, *Federal Jurisdiction* 734 (4th ed. 2003) ("Courts have broadly interpreted the [TIA] as preventing federal courts from interfering with virtually all forms of state and local taxes."); *id.* at 735 ("[L]ower courts generally have followed a commonsense approach, finding, for example, that registration fees . . . have the primary purpose of raising revenue and thus should be classified as taxes.").

-17-

imposed by a state park authority to regulate park usage and support only the upkeep of the park.

Applying the considerations set forth in *Marcus*, we cannot help but conclude that they weigh in favor of holding the specialty license plate assessments to be taxes. First, there is no question that the genesis of the special license plate assessment scheme was the Oklahoma Legislature, not some regulatory body; indeed, the amount of each assessment is expressly prescribed by statute. Second, critical under *Marcus* (as it was to Judge Cooley), the specialty plate licensing regime seeks not merely to cover its administrative costs but to raise revenue for a wide array of public purposes. *See supra* at 15-16. Finally, as the district court pointed out, the funds collected on top of the $8 reimbursement paid to the Tax Commission do not purport to "regulate" anyone by incentivizing or disincentivizing certain forms of conduct (like, say, controlling the overuse of state parks).

Plaintiffs respond by asking us to look to the facts of *Marcus* rather more than to the rule of law it applied. There, we held that Kansas assessments imposed on drivers for a decal entitling them to use parking spaces reserved for the physically disabled constituted a "fee" rather than a "tax under State law" for purposes of the TIA. We do not disagree that parking passes and specialty plates sound alike. But the statutory regimes before us could not be more different. Kansas chose to charge very little for handicap parking passes ($5.25) and

-18-

explicitly mandated that the fees imposed by the Department of Revenue for the placards "shall not exceed the actual cost of issuance." Kan. Stat. § 8-1,125(c) (1999). Thus, we emphasized in *Marcus* that the Kansas assessment "is expressly tied to the administrative costs of a specific regulatory scheme and, therefore, its essential character is regulatory." *Marcus*, 170 F.3d at 1312. Here, by contrast, the Oklahoma Legislature has created a statutory scheme whereby the vast bulk of speciality license plates cost their purchasers approximately two and four times the amount necessary to defray the costs of issuing the plates and excess funds are applied to a variety of public purposes. While Oklahoma and Kansas faced a similar issue in their vehicle registration regimes, they chose to address that issue in radically different ways, ways the plain language of the TIA and our precedent in *Marcus* bind us to find dispositive.

C

Even were we to look beyond the plain language and our controlling precedent in interpreting "taxes under State law," we find other indicia pointing us in the direction of recognizing the Oklahoma assessments as taxes.

In recognition of the breadth of the plain meaning of the term Congress employed, the Supreme Court has expressly instructed that the TIA is to be read as a "'broad jurisdictional barrier'" and is "first and foremost a vehicle 'to limit dramatically federal district court jurisdiction.'" *Arkansas v. Farm Credit Servs. of Centr. Ark.*, 520 U.S. 821, 825, 826 (1997) (quoting *Moe v. Confederated Salish*

-19-

*and Kootenai of Flathead Reservation*, 425 U.S. 463, 470 (1976), and *California v. Grace Brethren Church*, 457 U.S. 393, 408-09 (1982)). Thus, the Supreme Court has gone so far as to hold that the TIA deprived it of jurisdiction even in cases where the defendant State argued in *favor* of federal court review. *See Grace Brethren Church*, 457 U.S. at 417 n.38. Given the Court's direction, it would be especially incongruous for us to defy the plain meaning of the term "tax" and our precedent in *Marcus* to assert federal jurisdiction here.

The Supreme Court has also explained that the TIA serves an important role in the smooth operation of our federal system. "The federal balance is well served," the Court has written, "when the several States define and elaborate their own laws through their own courts and administrative processes and without undue interference from the Federal Judiciary. The States' interest in the integrity of their own processes is of particular moment respecting questions of state taxation. In our constitutional system, . . . [t]he power to tax is basic to the power of the State to exist [and the] . . . [e]nactment of the Tax Injunction Act of 1937 reflects a congressional concern to confine federal court intervention in state government." *Farm Credit Servs. of Cent. Ark.*, 520 U.S. at 826 (internal citation and quotation marks omitted). To enjoin Oklahoma's entire specialty plate regime (plaintiffs' preferred remedy) or even to enjoin a portion of it (plaintiffs' alternative remedy), would deny Oklahoma the use of significant funds: the law generated approximately $605,000 from the purchase of 33,000 special license plates issued

-20-

between August 1, 2002, and July 31, 2003, alone. (Am. Compl. ¶ 126.) Doing so would further operate to deny these funds to and thus disrupt a variety of state initiatives, ranging from education to environmental to adoption programs, which no party disputes serve legitimate and important state interests. Simply put, the relief sought here would implicate exactly the sort of federalism problems the TIA was designed to ameliorate.

The fact that the term "tax" is modified by the phrase "under State law" also counsels in favor of holding the TIA applicable. Of course, we have held that how a state labels an assessment does not resolve the question whether or not it is a tax (a question Oklahoma has not asked us to revisit). *Marcus*, 170 F.3d at 1311. But that does not mean that the phrase "under State law" is surplusage either; to the contrary, Congress is presumed to have added these words for some purpose. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). And, in fact, it has long been understood that taxes *under State law* can include many assessments that may not be taxes for purposes of *federal* law.

Specifically, while the Constitution gave Congress the "Power to lay and collect Taxes," U.S. Const. art. I, § 8, this power is limited in several ways. It has been debated, for example, whether the power to tax afforded by Article I can be

delegated by Congress to administrative agencies. *See, e.g., National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336 (1974). Also, taxes must be "uniform" under Section 8 of Article I and, thus, have to apply "'with the same force and effect in every place where the subject of it is found.'" *Fernandez v. Wiener*, 326 U.S. 340, 359 (1945) (quoting *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 594 (1884)). Further, Article I, § 9 forbids Congress from leveling direct or capitation taxes except in proportion to the census or enumeration commanded by the Constitution.[9] Aware and perhaps because of these limits, the Supreme Court has come to deem certain assessments as incidents of congressional authority arising from sources other than the (limited) taxing power discussed in Article I. Thus, for example, in *National Cable Television Association*, the Court faced a statute that allowed the Federal Communications Commission to prescribe, *inter alia*, a "fee, charge, or price, if any," in order to make the agency work self-sustaining. 415 U.S. at 337 (quoting 31 U.S.C. § 483a). Mindful of the canon of constitutional avoidance and anxious to "avoid constitutional problems" that it perceived might exist if the statute were read to be an (arguably impermissible) delegation of Congress's taxing power to an administration agency, the Court held that the "fee" was not a "tax" for Article I purposes because it sought only to cover the costs of an associated administrative

___

[9] The Sixteenth Amendment, of course, allows for the imposition of taxes on income (though not other items) without regard to apportionment among the States or to any census or enumeration.

-22-

regulation rather than aid in revenue raising. *Id.* at 340-41. Similarly, in the *Head Money Cases*, the Court faced an assessment authorized by Congress on vessels bringing passengers from foreign ports. 112 U.S. at 594-95. The plaintiffs argued, among other things, that the law ran afoul of the constitutional requirement that all taxes be applied "uniformly" because it was directed only to persons entering the country by ship, as opposed to by land or by rail. *Id.* at 594. To avoid such potential constitutional difficulties, the Court held that the charge did not arise from the taxing power of Article I, § 8 but instead was a "mere incident" of Congress's separate constitutional power to regulate commerce – what the Court described as "that branch of foreign commerce which is involved in immigration." *Id.* at 595; *see also* U.S. Const. art. I, § 8, cl. 3.

While the Supreme Court has limited what qualifies as an incident of the taxing power for constitutional purposes, it has recognized that its rulings do not necessarily resolve (or even implicate) the question what is a tax for other purposes, such as "under State law." As the Court put it in the *Head Money Cases*, sums demanded by the government may *not* be authorized pursuant to the "taxing power" of the Constitution but may still be properly deemed taxes in "a loose and more extended sense than was used in the [C]onstitution." *Id.* at 596.

Indeed, in our system of government, States have powers reserved to them that extend well beyond the powers of the national government. *See* U.S. Const. amend. X. These powers include an independent and plenary taxing authority "in

the most absolute and unqualified sense." *The Federalist No. 32*, at 199

(Alexander Hamilton) (Carl Van Doren ed., 1979). As exemplified by the

dictionary definitions, the plenary authority to tax under state law has historically

included a very wide array of extractions of property from private persons by a

sovereign for its use that may or may not be incidents of the rather more narrow

taxing authority granted in Article I.[10]

D

Seeking to avoid the conclusion that the TIA bars their claims, Motorists

advance two additional arguments that require close attention.

1. Motorists contest the application of the TIA on the ground that they are

not seeking to challenge an assessment imposed on them, but rather assessments

imposed on and paid by other persons or entities. This, they argue, is an essential

and dispositive distinction under the Supreme Court's teaching in *Hibbs v. Winn*,

542 U.S. 88 (2004). We are constrained to disagree. Nothing in the language of

---

[10] It bears mention that our holding is in harmony with that of the Fifth Circuit. In addressing a challenge under the TIA to a specialty license plate scheme in Louisiana, the Fifth Circuit held that the scheme involved "taxes under State law" because the funds collected from the program did not purport to "'regulate'" anything and "[a] dominant feature of the program, evidenced in over half of the provisions authorizing specialty license plates, is to raise revenue." *Henderson v. Stalder*, 407 F.3d 351, 358 (5th Cir. 2005) (Jones, J.). Given that Congress's purpose in passing the TIA was to "prevent federal courts from interfering with challenges to state and local revenue-raising measures," the Fifth Circuit was "unwilling to mischaracterize the Louisiana legislature's appropriations measures as 'fees' in order to achieve federal jurisdiction." *Id.* at 358-59.

the TIA indicates that our jurisdiction to hear challenges to state taxes can be turned like a spigot, off when brought by taxpayers challenging their own liabilities and on when brought by third parties challenging the liabilities of others. Rather, Congress plainly directed us that we "shall not enjoin . . . any tax under State law," without qualification – and nothing in *Hibbs* commands a result contrary to the Congress's express direction.

To be sure, the Supreme Court in *Hibbs* faced a plaintiff who sought to challenge the validity of tax credits provided to third parties. And in addressing the defendant's assertion that the TIA barred the plaintiff's claim, the Court did point out that TIA cases typically involve challenges brought by state taxpayers seeking to avoid their own state tax liabilities. *Id*. at 107-08. But the Court did so not to criticize extant lower court decisions holding that the TIA bars challenges brought by third parties to State law taxes.[11] Instead, the Court simply sought to underscore how unusual the case before it was compared with most TIA suits. Indeed, the Court proceeded to hold that the essential problem with defendant's assertion that the TIA barred the suit before it lay in the fact that the plaintiff there simply did not seek to enjoin the *levy or collection* of any *tax* under State law, as is typically the case, but instead sought to challenge the *provision* of a *tax credit*

---

[11] *See, e.g., Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 132 (4th Cir. 2000) (TIA barred challenge by landfill owners and waste transportation companies to a tax imposed on persons disposing of solid waste at landfills; no distinction made between transport company upon whom the tax was imposed and landfill owners merely required to collect tax).

aimed at limiting or constraining State tax revenues. *Hibbs*, 542 U.S. at 95. Simply put, the Court held that giving away a tax credit is a very different thing than assessing, levying or collecting a tax.

The Court explained that the "moorings" of the TIA rest on a "state-revenue-protective" rationale. *Id.* at 106. *See also id.* at 105 (emphasizing the protection of "the collection of revenue" as key impulse in the Court's jurisprudence); *id.* at 106 (noting that prior decision enforcing the TIA was appropriate because "[f]ederal-court relief . . . would have operated to reduce the flow of state tax revenue"). It then proceeded to hold that a challenge brought to a tax credit does not implicate this core concern precisely because the entry of the relief sought by the plaintiffs – the elimination of a tax credit – is not an attack on a State measure aimed at raising revenue. *See id.* at 108-09. While the TIA embodies an articulated concern about protecting State revenue raising efforts, it simply does not reflect any such concern "about federal courts' flogging state and local governments to collect additional taxes." *Id.* at 109 (quoting *Dunn v. Carey*, 808 F.2d 555, 558 (7th Cir. 1986)). Our case, of course, does not involve the somewhat unusual circumstance confronted by *Hibbs* of citizens seeking to eliminate tax credits and "flog" the State to collect more tax revenues, but instead falls in the traditional heartland of TIA cases – an

effort expressly aimed at preventing the State from exercising its sovereign power to collect certain revenues.[12]

Plaintiffs respond that enjoining Oklahoma from collecting revenues from the Choose Life, Adoption Creates Families, and other specialty license plates specifically authorized by statute might not reduce state revenues. After all, they say, motorists would remain free to apply for specialty plates under the legislature's 2005 "all comers" law allowing any group with 500 prepaid applications to obtain a plate of their liking. Plaintiffs' submission here, however, is curiously in tension with their response to defendants' mootness argument. There, plaintiffs contended that the legislature's new rule requiring 500 prepaid applications for new specialty plates is considerably more onerous than the legislature's preexisting scheme immediately approving certain plates for issuance. Here, by contrast, plaintiffs seem to suggest that an injunction against the old legislative regime would result in no net revenue loss for the State because a one-for-one substitution would take place – with motorists simply migrating from the old to the new licensing regime.

In any event, there is simply nothing in the TIA or *Hibbs* suggesting that federal courts can entertain challenges to state taxes on the basis of predictive judgments that doing so will not harm state coffers; rather our jurisdiction is

_____

[12] As with our reading of the TIA, our understanding of *Hibbs* accords with the views expressed by the Fifth Circuit in its decision in *Henderson*. *See* 407 F.3d at 359.

precluded by the plain language of the TIA in *all* cases seeking to enjoin the levy or collection of taxes under State law. Were the case otherwise, judges might be free to become second rate, supply-side economists, hazarding guesses that enjoining this or that revenue raising measure would help rather than hurt overall tax collections. But we are not authorized by Congress to be in the business of forecasting the likely fiscal effects of variations on state tax policy; nor do we think ourselves well equipped to do so.

2. Picking up on an idea recently advanced by the Sixth Circuit, plaintiffs seek in their reply brief, and in a notice pursuant to Federal Rule of Appellate Procedure 28(j), to supplement their "fee rather than tax" and *Hibbs*-based arguments with a new, alternative contention. Now they seek to argue that Oklahoma's assessment is not a tax (or a fee) because it is a mere contractual exchange of money for a commodity. (*See* Appellant's Reply Br. at 16-19; Appellant's Supp. Auth. (filed April 10, 2006).)[13]

It is our general rule, however, that arguments and issues presented at such a late stage are waived. *See Bowdry v. United Airlines, Inc.*, 58 F.3d 1483, 1490 (10th Cir. 1995) (citing*, inter alia*, *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278-79 (10th Cir. 1994) (White, J.)); *accord Herbert v. Nat'l Academy of*

---

[13] *See, e.g.*, Appellant's Reply Br. at 16 ("Motorists' opening appellate brief explains at length why the amounts paid to purchase special plates are fees (not taxes) and are thus not implicated by the TIA. However, even if Motorists are wrong and the amounts are not fees, it does not follow that the amounts necessarily must be taxes.").

*Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (declining to decide new argument that statute did not take away jurisdiction from the court, explaining that "[w]hile courts always must decline to decide cases over which they have no power, the converse of that rule does not hold:  Article III tribunals are not absolutely bound to render judgment on every argument over which they obtain jurisdiction").  As we have explained, the reasons for our rule are two-fold:  "First, to allow an appellant to raise new arguments at this juncture would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response. . . . Secondly, it would also be unfair to the court itself, which, without the benefit of a response from appellee to an appellant's late-blooming argument, would run the risk of an improvident or ill-advised opinion, given our dependence as an Article III court on the adversarial process for sharpening the issues for decision." *Headrick*, 24 F.3d at 1278 (internal quotation marks omitted).

Of course, our rule against entertaining new arguments in reply in no way precludes us from supplementing the contentions of counsel through our own efforts. *Id.*  But neither does it compel us to undertake such self-directed research or pursue late and undeveloped arguments, and we exercise caution in doing so, especially in complex cases where (as here) highly competent counsel have represented the parties throughout all stages of the proceedings.  Our system of justice, after all, is not a self-directed inquisitorial one; to avoid error, we are dependent on the full development of issues through the adversarial process and the

initial testing of ideas in trial courts where advocates have an opportunity to present more than thin briefs and fifteen minute oral arguments. For these reasons, we need not and do not issue any holding on plaintiffs' contractual exchange argument and leave a final decision on this score for another day.

Just how complex and difficult the new argument plaintiffs ask us to address, and thus the reason for our particular reluctance to decide it with finality, is worth pausing to underscore. Plaintiffs borrow their new submission from *ACLU of Tennessee v. Bredesen*, 441 F.3d 370, 373 (6th Cir. 2006), *cert. denied* __ U.S. __, 126 S.Ct. 2972 (June 26, 2006), a recent decision in which our sister court rejected the notion that a governmental assessment must either be a tax or a fee – the very dichotomy plaintiffs have urged courts to adopt throughout the proceedings in this circuit. (Appellant's Opening Br. at 23-28.) Rather, the Sixth Circuit held that Tennessee's statutory regime for specialty license plates "creates contractual debts to pay but imposes no tax. Instead of using its sovereign power to coerce sales, Tennessee induces willing purchases as would any ordinary market participant." *Id*. at 374.[14]

---

[14] The Sixth Circuit itself relied in substantial part on a recent dissent from denial of rehearing *en banc* in the Fifth Circuit. *Henderson v. Stalder*, 434 F.3d 352, 353 (5th Cir. 2005) (Davis, J., dissenting from denial of rehearing *en banc*). And though the Sixth Circuit overcame the TIA hurdle in its case, the end result there was no different than it is here – the Sixth Circuit still dismissed plaintiffs' claims on a motion to dismiss, albeit one directed to the merits of the constitutional claims. *Bredesen*, 441 F.3d at 375-80.

While we do not for a moment doubt that the State can obtain funds through means other than "taxes" and "fees,"[15] whether plaintiffs' assertion that Oklahoma's issuance of specialty plates amounts to nothing more than an ordinary market sales contract is far from clear. The *Bredesen* court relied on two particular factors in holding that the license plate charge was not a tax: (1) a motorist voluntarily pays the charge, and (2) the State acts as "an ordinary market participant." 441 F.3d at 374. The court noted that these two factors "apply a fortiori to ordinary purchases, like the purchase of government bonds, or the purchase of a souvenir at a state park gift store. Such purchase payments can hardly be termed 'taxes' as opposed to ordinary payments on voluntary contracts." *Id.*

But, starting with the latter consideration, we are unaware of anything approaching an "ordinary market" for specialty license plates, at least in Oklahoma. Quite unlike the (some might say over-) active market for souvenir snow globes sold in state park gift shops, the State brooks no competitors in the supply of specialty license plates. As sovereign, it exercises exclusive (monopoly)

_____

[15] It seems to us that *Bredesen* is absolutely right insofar as it recognized that the tax-fee dichotomy arose in a different context to answer a different question than that posed by the TIA. 441 F.3d at 374. But the dichotomy arose originally not from any circuit court opinion (as *Bredesen* suggests); instead, it seems to have originated in the Supreme Court's decision in *National Cable Television Association*, 415 U.S. 336. That case, of course, had nothing to do with the scope of the term "tax under State law" in the TIA, but was, as we have discussed, one in which the Supreme Court strained to place the FCC's authority to impose certain assessments outside the constitutional taxing power of Article I, § 8 in order to avoid what it perceived to be a potentially nettlesome non-delegation problem. *See supra* at 22-23.

power to issue those items. *See generally* 47 Okla. Stat. § 1113; *see also* Cooley, *supra*, at 72 (taxation is "the exercise of the sovereign power to raise a revenue"). Citizens cannot purchase specialty plates from some other source, affix them to the rear of their cars, and motor down the highway – at least without the substantial risk of incurring something substantially worse than either a tax or a fee.[16] From the pleadings before us, moreover, it appears that the marginal cost of specialty plates does not exceed $8 (Am. Compl. ¶ 65),[17] and we know that in the competitive market for bumper stickers one can find virtually any message ready to be affixed to the back of a car for substantially less money still.[18] The fact that Oklahoma is able, under these circumstances, to charge up to $35 for a specialty plate bearing a simple message calls into question whether ordinary market conditions really prevail in the sale and purchase of specialty license plates.

---

[16] *See* 47 Okla. Stat. § 1151(A)(2) (making criminal the alteration of a license plate); *id.* § 1151(A)(5) (criminalizing the operation of a vehicle without a proper license plate or with a plate for which all taxes have not been paid).

[17] "In a perfectly competitive market, retail prices drop instantly to the marginal cost of the most efficient company." *Verizon Comms., Inc. v. FCC*, 535 U.S. 467, 505 (2002) (citing N. Gregory Mankiw, *Principles of Economics* 283-288, 312-313 (1998)).

[18] For example, http://www.stickergiant.com (last visited March 2, 2007) offers thousands of different bumper stickers, most for under $3. Stickers with slogans supporting abortion rights, such as "Pro Child Pro Choice"or "Keep Your Laws Off My Body" can be purchased for $2.99. Stickers demonstrating the opposite view, such as "It Is Not a Choice, It Is a Child," can be purchased for the same price.

We are also uncertain whether the fact that the transaction to purchase specialty plates (as opposed to ordinary plates) may be "voluntary" dictates that the accompanying supracompetitive charge is not a tax. On the one hand, the prevailing definition of tax in existence at the time that the Tax Injunction Act was enacted contemplated that taxes are involuntary in nature. *See supra* at 14-17. And, in this case, the extra charge is for a discretionary product that the state is offering, and it is purely up to the consumer to decide whether to buy it. The extra words on the specialty plate are not necessary to exercise the privilege regulated by the state – *i.e.*, driving. The basic $15 charge covers the privilege of driving, and the incremental cost may simply be a commercial price paid by a willing motorist to purchase a license plate with a slogan that is pleasing to the motorist.

On the other hand, private citizens routinely incur different levels of compulsory taxation based on the voluntary choices they make. Thus, for example, in addition to the normal taxes one pays when purchasing a new car, a higher "luxury" tax may be incurred by those buyers who choose a particularly expensive vehicle. *See, e.g.,* 26 U.S.C. § 4001(a) (1991). Those who incur this luxury tax do so "voluntarily" in the same sense that those who purchase specialty license plates bearing some preferred message do so "voluntarily." That is, just as the Cadillac owner who chooses a fancier car foresees that he or she will also have to pay an additional (compulsory) assessment to the state, a motor vehicle owner who chooses to display a specialty plate in Oklahoma knows that he or she must pay the

sovereign an additional (compulsory) sum for that privilege. The fact that the transaction in either case is voluntarily undertaken with full foresight of the inevitable (and most certainly not bargained for or voluntarily chosen) assessment makes the assessment involved no less a tax. Indeed, though our car-oriented culture may make it sometimes seem otherwise, the very decision to purchase and drive a car is itself a voluntary one (no one is forced to have a car, after all) and it, too, forseeably involves the payment of a sales tax and a tax for even a basic license plate. So it is that a very great many taxes we are every day compelled to pay are a result of our voluntary decisions (the decision to work harder this year and perhaps risk a higher income tax bracket, the decision to purchase a home rather than rent and thus incur real estate taxes, etc.). As the Fifth Circuit put the point in the process of rejecting the very analysis advanced by the plaintiffs before us in their reply brief: "Any party who pays special assessments to the government does so 'voluntarily' in order to engage in particular activity, whether that activity is homebuilding, engaging in a regulated industry or obtaining permission to park in handicapped spots." *Henderson*, 407 F.3d at 358. One thus simply cannot meaningfully distinguish taxes from "ordinary market transactions" on the basis of a taxpayer's intent. *Accord id.* (holding that it is "not the taxpayer's motivation" that distinguishes taxes from other transactions).

E

Having concluded that the Oklahoma specialty license plate assessments qualify as "taxes under State law," our analysis under the TIA remains still unfinished. Before declining federal jurisdiction, the statute requires us to decide whether Oklahoma affords a "plain, speedy and efficient" remedy in its courts for those seeking to challenge its taxes. 28 U.S.C. § 1341. "[I]f the state provides adequate procedural due process to allow a taxpayer to raise any constitutional objections, then the state has done all that is required under the Tax Injunction Act, and as a consequence, the federal courts are foreclosed from hearing such a tax challenge." *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1192 (10th Cir. 1998) (citing *California v. Grace Brethren Church*, 457 U.S. 393, 412-13 (1982)). If state courts fail to afford such due process, however, the doors to federal court remain open to ensure an adequate forum for the dispute.

We have heard no convincing reason to suppose that Oklahoma fails to provide its citizens sufficient process for challenging its tax laws; very much to the contrary. In addition to affording a general right to protest taxes before the Tax Commission, *see generally* 68 Okla. Stat. §§ 201, *et seq.*, Oklahoma has specifically created "a right of action . . . to afford a remedy to a taxpayer aggrieved by the provisions of this article or of *any other state tax law*." 68 Okla. Stat. § 226(a) (emphasis added). The provision creates "a legal remedy and a right of action" in any case where a party claims, *inter alia*, that "the collection thereof

-35-

[is] violative of any Congressional Act or provision of the Federal Constitution." *Id.* § 226(c).[19] Motorists provide no reason why they cannot avail themselves of these provisions, nor do they respond to the defendants' argument that this provision ensures them a speedy, efficient, and fair hearing.

Oklahoma law also specifically provides that parties may apply for and receive injunctive and declaratory relief as against unlawful taxes, exactly the sort of relief Motorists seek here. *See* 12 Okla. Stat. § 1397 ("An injunction may be granted to enjoin the enforcement of a void judgment, the illegal levy of any tax, charge or assessment, or *the collection of any illegal tax*, charge or assessment, or any proceeding to enforce the same; and any number of persons whose property is affected by a tax or assessment so levied may unite in the petition filed to obtain such injunction.") (emphasis added); *see also id.* §§ 1651-57. In their brief, Motorists purport to quote Section 1397 as allowing an injunction only with respect to "the collection [from them] of any illegal tax, charge or assessment." (Appellant's Opening Br. at 29.) With their addition of the bracketed language, Motorists argue that Section 1397 applies only to taxpayers challenging the collection of taxes levied *against them* and not to third party challenges such as the one they seek to pursue. But the statute simply does not contain the language the

---

[19] That this provision also purports to allow such actions in federal court as well as state court, *see* 68 Okla. Stat. § 226(c), does not affect our jurisdictional analysis, as the Oklahoma Legislature obviously cannot usurp Congress's prerogative in expanding or contracting the scope of a federal court's jurisdiction.

-36-

Motorists complain about (and themselves add), and we have been offered no reason to suppose that Oklahoma courts will interline the plain words of the statute in this fashion.

## III

In claims five and six, ORC challenges not the *collection* of any tax but the manner in which money is *distributed* from the Choose Life Assistance Program. ORC argues in these remaining claims that the State impermissibly denies it the opportunity to receive monies from the Choose Life Assistance Program based solely on its viewpoint, in violation of the First and Fourteenth Amendments. More specifically, the Choose Life Assistance Program directs monies to groups that counsel "pregnant women who are committed to placing their children for adoption." 47 Okla. Stat. § 1104.6(C)(3). ORC indicates that it would like to offer such counseling services to women and has applied for funding to do so, but that its applications have been denied due to a statutory restriction preventing the disbursement of program funds to organizations that are also "associated with any abortion activities."[20] *Id.* § 1104.6(C)(4); *see also id.* § 1104.6(D). ORC contends

---

[20] We identified a potential ripeness concern with counts five and six. The operative complaint states merely that "ORC *would like to* apply for funding pursuant to 47 Okla. Stat. § 1104.6," not that ORC had ever so applied. (Am. Compl. ¶ 27 (emphasis added).) Had ORC not given DHS the opportunity to consider an application for disbursement under the Choose Life Assistance Program, we would have had serious concerns about whether we were being called upon to determine a case based upon an event which may not happen at all. What if ORC did apply and DHS, if against all the odds, granted the application? At oral argument, however, both parties informed us the ORC *has* applied for funding from the Choose Life Program Fund in fiscal years 2006

(continued...)

-37-

that this restriction amounts to an "unconstitutional condition" on the exercise of its First Amendment rights. Defendants respond, and the district court held, that the Eleventh Amendment immunizes them from such a claim.[21]

A

The Eleventh Amendment provides that

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. By its plain terms, nothing in the Amendment would appear to bar ORC's claims as they involve purely an intrastate matter – ORC claims to be a non-profit organization located in Oklahoma (Am. Compl. ¶¶ 20-21), and it seeks to sue only its own sovereign state. But the plain terms of the Amendment have been much embroidered. The Supreme Court in *Hans v. Louisiana*, 134 U.S. 1 (1890), long ago instructed inferior federal courts that the

_____

[20](...continued)
and 2007, and that DHS *has* denied its applications for the very reason that forms the basis of claims five and six – that is, because ORC is associated with abortion activities. The parties thereafter supplemented the record before us with copies of ORC's applications and DHS's denials. We are thus satisfied that ORC's claims are indeed properly before us.

[21] Certain of the defendants argue in a footnote that claims five and six are also barred by the TIA because the relief sought with respect to those claims also implicates the State's tax collection power. (Tax Commission Defendants' Resp. Br. at 44 n.12.) We will not consider an argument raised in such a perfunctory manner. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002); *accord Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) (issue raised only in footnote before trial court deemed waived).

-38-

Amendment should be read to preclude even suits by a citizen against its own sovereign state; "'inherent in the nature of sovereignty,'" *Hans* held, "'is the right not to be amenable to the suit of an individual without its consent.'" *Id.* at 13 (quoting *The Federalist No. 81*, at 547 (Alexander Hamilton) (Carl Van Doren ed. 1979)). Though the Court has sometimes criticized *Hans* and more than once considered overruling it,[22] *Hans* remains the law.

The Supreme Court has, however, issued a series of rulings limiting *Hans*'s reach. Perhaps the most significant, and the one most relevant for our purposes, is *Ex parte Young*, 209 U.S. 123 (1908). In *Ex parte Young*, the Court held that the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself. *Young*'s effort to alleviate the effect of *Hans*, however, itself contains some logical curiosities of its own. *Young* proceeds on the admitted fiction that a suit seeking an injunction against a state employee seeking to do his or her job is (somehow) different in substance than a suit against the state itself. *Pennhurst State Sch. & Hosp. v.*

---

[22] *See, e.g., Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 31-35 (1989) (Scalia, J., concurring and dissenting); *Welch v. Tex. Dep't of Highways & Public Transp.*, 483 U.S. 468, 495-96 (1987) (Scalia, J., concurring); *id.*, at 519-21 (Brennan, J., dissenting)*; Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 298-302 (1985) (Brennan, J., dissenting). *See also* Carlos Manuel Vázquez, *What is Eleventh Amendment Immunity?*, 106 Yale L.J. 1683, 1694 n.42 (1997) (collecting scholarly criticism of *Hans*).

*Halderman*, 465 U.S. 89, 105 (1984) (noting the "fiction of *Young*").[23]  It also proceeds on the related assumption that the state employee is somehow engaging in something other than state action for purposes of the Eleventh Amendment yet is engaging in sufficient state action for purposes of the Fourteenth Amendment to provide us with jurisdiction; after all, we can enforce a constitutional right only as against state, not private, action.  *See id.*; *Virginia v. Rives*, 100 U.S. 313, 318 (1879).  *Young* further commands us to afford federal jurisdiction to federal claims even when a competent state forum stands ready and able to adjudicate those claims; indeed, the presence or absence of a state forum simply does not enter into the *Young* equation.[24]

Adding to the rococo quality of Eleventh Amendment jurisprudence, the Supreme Court has in recent years added a new gloss on *Young*'s gloss on *Hans*'s gloss on the Eleventh Amendment.  First, in 1996, the Court held that *Young* suits

---

[23] *See also* Kenneth C. Davis, *Suing the Government by Falsely Pretending to Sue an Officer*, 29 U. Chi. L. Rev. 435 (1962) ("You may get relief against the sovereign if, but only if, you falsely pretend that you are not asking for relief against the sovereign. The judges often will falsely pretend that they are not giving you relief against the sovereign, even though you know and they know, and they know that you know, that the relief is against the sovereign.").

[24] *But see Young*, 209 U.S. at 176 (Harlan. J., dissenting) (criticizing majority for failing to recognize that "[w]e must assume – a decent respect for the states requires us to assume – that the state courts will enforce every right secured by the Constitution"); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270-74 (Kennedy, J.) (arguing that *Young* has special significance where no state forum available); *id.* at 276 ("It would be error coupled with irony were we to bypass the Eleventh Amendment, which enacts a scheme solicitous to the States, on the sole rationale that state courts are inadequate to enforce and interpret federal rights in every case.").

are not available where Congress "has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). That is, "federal courts are not free to imply the wide-ranging, judge-made remedial doctrine of *Ex parte Young* when Congress has seen fit to craft a significantly narrower statutory remedy." *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1189 (10th Cir. 1998). A year later, the Court instructed that *Young* may not be rotely applied; instead, lower courts "must ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." *Coeur d'Alene*, 521 U.S. at 269. The Court added that

> [t]o interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his official capacity, would be to adhere to an empty formalism and to undermine the principle . . . that the Eleventh Amendment represents a real limitation on a federal court's federal-question jurisdiction.

*Id*. at 270. As the Court put it, the "real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleadings." *Id.*; *see also Alden v. Maine*, 527 U.S. 706, 756-57 (1999).

In the suit before us, defendants do not dispute that claims five and six meet the *Ex parte Young* formalisms – that is, those claims seek prospective relief, no damages, and are directed (at least nominally) against state officials rather than the State of Oklahoma itself. Instead, defendants urge us to dismiss this suit on the basis of the new gloss added to *Young* by *Coeur d'Alene*. But this only raises

the questions:  What exactly did *Coeur d'Alene* do to the state of the Supreme

Court's *Ex parte Young* jurisprudence?[25]  And what does *Coeur d'Alene* mean for

this case?

*Coeur d'Alene* involved multiple and fractured opinions.  Justice Kennedy

wrote the lead opinion but commanded a majority with respect only to certain

sections.  When it came to the key question how lower courts should change their

analyses under *Ex parte Young*, Justice Kennedy wrote for just himself and Chief

Justice Rehnquist to suggest a "case-by-case approach" in which lower courts

should "reflect a sensitivity" to a "broad" range of questions ranging from the

nature and significance of the federal rights at stake, the state interests implicated

by the lawsuit, and the availability of a state forum.  521 U.S. at 280.  Federalism

and comity interests, Justice Kennedy wrote, should receive consideration in every

case.  *Id.* at 278-280.  Turning to the specific matter before him, in which the

Coeur d'Alene Tribe of Idaho sought a declaratory judgment action to establish its

entitlement to exclusive use and occupancy of submerged lands under Lake Coeur

---

[25]  As one critic has put it, "The most unsettled aspect of the newly developing law [regarding the Eleventh Amendment] is the effect of *Coeur d'Alene Tribe*."  John H. Clough, *Federalism: The Imprecise Calculus of Dual Sovereignty*, 35 J. Marshall L. Rev. 1, 4 (2001); *see also* Laurence H. Tribe, *American Constitutional Law* 566 (3d ed. 2000) ("The meaning of . . . *Coeur d'Alene* for *Ex parte Young* is a matter of great debate among commentators.") (collecting articles); Carlos Manuel Vázquez, *Night and Day:* Coeur d'Alene*, Breard*, and the Unraveling of the Prospective-Retrospective Distinction in Eleventh Amendment Doctrine*, 87 Geo. L.J. 1, 42 (1998) ("Exactly what the Court held [in *Coeur d'Alene*], and thus how radically it changed [Eleventh Amendment] doctrine, is a matter of some dispute.") (hereinafter "Vázquez").

d'Alene, Justice Kennedy wrote that the lawsuit sought to "divest the State of its sovereign control over submerged lands, land with a unique status in the law and infused with a public trust the State itself is bound to respect." *Id.* at 283. After balancing the competing federal and state interests at stake, and acknowledging the ready availability of a state forum to hear the dispute, Justice Kennedy concluded that "[t]he dignity and status of its statehood allow[ed] Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these claims in its own courts." *Id.* at 287-88.

Justice O'Connor wrote separately for herself and Justices Scalia and Thomas to express disagreement with this "reformulation" of *Ex parte Young. See* 521 U.S. at 296. Justice O'Connor worried that Justice Kennedy's approach would replace "a straightforward inquiry" under *Ex parte Young* with a "vague balancing test that purports to account for a 'broad' range of unspecified factors." *Id.* And, as with the balancing of federal and state interests, Justice O'Connor appeared to reject the notion that the availability (or unavailability) of a state forum should play any role in our Eleventh Amendment analysis under *Young. Id.* at 292; *see also supra* at note 24. Yet, Justice O'Connor joined Justice Kennedy in holding that the plaintiff's suit should be dismissed despite its seeming compliance with *Ex parte Young*'s formalisms. Her precise reason for doing so, however, is not free from dispute.[26] It appears that Justice O'Connor modified *Ex*

_____

[26] *See* Vázquez, *supra* note 25; Eric B. Wolff, Coeur d'Alene *and Existential*

(continued...)

-43-

*parte Young* slightly by expanding what constitutes impermissible retrospective relief. Though the Tribe's claim was *formally* pled as an action for declaratory and injunctive relief, Justice O'Connor noted that its request for a declaration that the State did not own the submerged lands at issue was really, in *substance*, tantamount to a request to transfer title over huge tracts of lands, a form of relief much akin to a (significant) retroactive monetary judgment and not at all like a run of the mill *Ex parte Young* suit seeking to bar the future implementation of regulations issued by a state regulatory body. *Id.* at 291.[27] Thus, Justice O'Connor seemed to suggest that we must assess whether a claim seeks relief effectively equivalent to a retrospective judgment regardless of how it is formally pled or denominated.

B

As the narrower approach commanding the fifth vote, we have previously acknowledged that Justice O'Connor's opinion provides the controlling guidance for lower courts and sought to apply that approach, as best we understood it, in

-----

[26](...continued)
*Categories for Sovereign Immunity Cases*, 86 Cal. L. Rev. 879, 916 (1998) (discussing Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 Mich. L. Rev. 867 (1969), and Louis L. Jaffe, *Suits Against Government and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1 (1963)).

[27] *Ex parte Young*, like many suits in which the doctrine it set forth has been applied, involved a suit against state officers seeking to enjoin enforcement of a utility commission order that allegedly violated federal law. 209 U.S. at 129.

*ANR Pipeline*. 150 F.3d at1190. There, we wrote that "[i]n light of *Coeur d'Alene Tribe*, federal courts must examine whether the relief being sought against a state official 'implicates special sovereignty interests.' If so, we must then determine whether that requested relief is the 'functional equivalent' to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment," such as a retrospective money judgment. *Id.*

After our decision in *ANR Pipeline*, however, the Supreme Court in *Verizon Maryland v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), had occasion to return to this area. There, the Supreme Court reviewed a Fourth Circuit decision articulating an approach to sovereign immunity that closely tracked our approach in *ANR Pipeline*:

> [T]o determine whether *Ex parte Young* authorizes this suit against State officials, we must evaluate the federal interests served by permitting a federal suit against individual members of the Maryland Public Service Commission, taking into account the remedial scheme for enforcement of federal law that Congress has established in the Telecommunications Act of 1996. Then, with those federal interests understood, we must determine whether the federal suit would unduly sacrifice the important value of Maryland's sovereign immunity.

*Bell Atlantic Md. v. MCI WorldCom Inc.*, 240 F.3d 279, 295 (4th Cir. 2001), *rev'd by Verizon Md.*, 535 U.S. at 648.

The Supreme Court reversed. In doing so, a clear majority of the Supreme Court followed Justice O'Connor's approach in *Coeur d'Alene* and instructed lower courts definitively that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a

'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md.*, 535 at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring)). Emphasizing the importance of the adverb "properly" and that formal pleading titles do not necessarily control, the Court explained that, in the case before it, "no past liability of the State, or of any of its commissioners, is at issue. [The lawsuit] does not impose *upon the State* a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials. . . . Insofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." *Id.* at 646 (internal citations and quotation marks omitted).

The Supreme Court's formulation of *Coeur d'Alene* in *Verizon Maryland* is thus somewhat different from what we had understood it to be in *ANR Pipeline*. In rejecting the Fourth Circuit's analysis, the Supreme Court in *Verizon Maryland* clarified that the courts of appeals need not (and should not) linger over the question whether "special" or other sorts of sovereign interests are at stake before analyzing the nature of the relief sought. Thus, to the extent that our decision in *ANR Pipeline* read *Coeur d'Alene* as requiring "federal courts [to] examine whether the relief sought against a state official 'implicates special sovereignty interests,'" 150 F.3d at 1190, we recognize today that *Verizon Maryland* abrogated this step. Instead, the Supreme Court has instructed that we are to proceed

-46-

immediately in every case to the "straightforward [or so one might hope] inquiry" whether the relief requested is "properly" characterized as prospective or is indeed the functional equivalent of impermissible retrospective relief. *Verizon Md.*, 535 U.S. at 645; *see also Republic of Paraguay v. Allen*, 134 F.3d 622, 628-29 (4th Cir. 1998) (reading *Coeur d'Alene* as requiring lower courts to analyze whether relief sought is the "'functional equivalent'" of retrospective relief "notwithstanding [the fact that the] claimed violation was continuing and the relief sought was only prospective in nature").

Following the Supreme Court's most recent and definitive guidance in *Verizon Maryland*, the sole question for us becomes whether the relief sought by ORC is prospective, not just in how it is captioned but also in its substance. The State appears to wish the law were otherwise, pursuing arguments that track to a significant degree the sort of case-specific analysis of the state interests at stake that the Fourth Circuit pursued in *Verizon Maryland*. But we are bound by the law as it is, not as one might wish it to be. And *Verizon Maryland* has done much to make clear(er) the law that binds us.

With the dismissal of claims one through four, the only remaining relief sought by ORC relates to the statutory provisions prohibiting disbursement to organizations which engage in abortion-related activities, that is 47 Okla. Stat. § 1104.6(C)(4) and (D). Specifically, ORC seeks (i) a declaration that prohibiting the distribution of monies from the Choose Life Assistance Program based on

abortion-related speech is unconstitutional; (ii) an injunction to stop the Defendants from enforcing 47 Okla. Stat. § 1104.6(C)(4) and (D), which prohibit distribution to such organizations; and (iii) severance of those subsections from the rest of the statute. (Am. Compl. ¶ 166.) By its terms, ORC's complaint does not seek a money judgment for any past alleged infractions of federal law. Neither does it seek to impose any constraints on the State's ability to decide which specialty license plates to allow or disallow. Nor does it seek to dictate which programs the State may choose (or not choose) to fund with revenues from its specialty license plate scheme. Nothing in ORC's suit calls to mind the sort of literal land grab effort made by the plaintiffs in *Coeur d'Alene* with its consequent significant implications on the state fisc.[28] Viewing the facts in the light most favorable to ORC, we are unable to conclude that, were ORC to prevail, Oklahoma's specialty license plate program would be any less financially lucrative for the State, or that the State would be inhibited in any of its funding options, including its decision to collect and spend revenues in aid of adoption activities through the Choose Life Assistance Program. Instead, akin to *Ex parte*

_____

[28] Lower courts that have found *Coeur d'Alene* applicable have involved just such circumstances. *See, e.g., Western Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004) (claiming that the State of New York was wrongfully in possession of 10 counties); *Ysleta Del Sur Pueblo v. Laney*, 199 F.3d 281 (5th Cir. 2000) (seeking to eject state officers from piece of real property); *MacDonald v. Vill. of Northport, Mich.*, 164 F.3d 964 (6th Cir. 1999) (seeking declaration that right-of-way that provided access to navigable waterway was the lawful property of plaintiffs).

*Young* and *Verizon Maryland*, ORC's injunction claim seeks to preclude only the future enforcement of one aspect of a complex regulatory scheme, and its claim for declaratory relief adds nothing of substance to this request. *See Verizon Md.*, 535 U.S. at 645 ("We have approved injunction suits against state regulatory commissioners [under *Young*] . . . . Indeed, *Ex parte Young* itself was a suit against state officials . . . to enjoin enforcement of a railroad commission's order requiring a reduction in rates.").[29] That is, ORC's complaint seeks only to prohibit the State in the future from denying Choose Life Assistance Program funds to organizations like ORC because they also advocate abortion. According to ORC, Oklahoma imposes a so-called "unconstitutional condition" insofar as the State allegedly provides no way for ORC to receive such funding to support its adoption counseling services and still exercise its First Amendment right to speak out about abortion, even using entirely private funds in entirely distinct programs. To participate in the State's Choose Life Assistance Program, ORC contends it effectively must give up its constitutionally protected right to advocate for abortion even on its own proverbial time and using its own (non-governmental) funds.[30]

---

[29] This stands in contrast to the situation we faced in *ANR Pipeline*. Had we allowed the suit to go forward in *ANR Pipeline*, a federal court would have been in the position of effectively rewriting a not insignificant portion of Kansas's property tax code. *ANR Pipeline*, 150 F.3d at 1194.

[30] As the Supreme Court explained in *Rust v. Sullivan*, the problem of unconstitutional conditions arise in cases where "the Government has placed a condition

(continued...)

-49-

Of course, had ORC's complaint gone further – seeking, for example, to require the State to fund its abortion-related programs – we would have faced a very different and considerably more difficult question under *Coeur d'Alene* and *Verizon Maryland*.[31]  But in this case, even if ORC were to prevail and obtain the relief sought in its amended complaint, the State would remain free to promote adoption and ensure that none of its monies go to abortion-related activities or any other activities of which it disapproves.[32]  Indeed, ORC agreed at oral argument that the Supreme Court's ruling in *Rust v. Sullivan*, 500 U.S. 173 (1991), allows

---

[30](...continued)
on the *recipient* of the subsidy rather than on the particular program or service, thus effectively prohibiting the recipient from engaging in the [constitutionally] protected conduct outside the scope of the [government-]funded program."  500 U.S. 173, 197 (1991) (emphasis in original).  Thus, in one early application of the doctrine, the Court struck down a California law which required persons to swear an oath that they did not advocate for the overthrow of the government of the United States or the State of California in order to receive a tax exemption. *Speiser v. Randall*, 357 U.S. 513, 516 (1958).  In doing so, the Court held that "[t]o deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech," which "necessarily will have the effect of coercing the claimants to refrain from the proscribed speech." *Id.* at 518, 519.  The Court added that "when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until the State comes forward with sufficient proof to justify its inhibition." *Id.* at 528-29.

[31]  *See, e.g., Barton v. Summers*, 293 F.3d 944, 951 (6th Cir. 2002) (holding that an attempt to force the State to make a particular allocation of Medicaid funds despite congressional authorization allowing the State considerable discretion amounted to an effort to obtain money damages impermissible under *Coeur d'Alene*).

[32]  Given the 2005 amendments, however, it now appears that Oklahoma law might permit a license plate expressing support for – and even funding – abortion-related activities. *See supra* at 7.

the State to make a choice to support adoption rather than abortion-related programs.[33] ORC further acknowledged that it would be entirely permissible for Oklahoma, consistent with the regime approved by the Supreme Court in *Rust,* to require private organizations (like ORC) that support both adoption and abortion to create a structurally separate affiliate that does not engage in abortion activities to receive and account for governmental funds in order to ensure that public monies are in no way intermingled with privately raised funds used for the group's separate abortion-related activities. *Cf. Harris v. Owens*, 264 F.3d 1282, 1293 (10th Cir. 2001) (holding that suit to obtain share of funds from tobacco settlement would not impermissibly intrude on state's interest in shaping law-enforcement remedies where "[t]he state and the tobacco companies have already determined how much money will be paid to the state; Harris merely seeks his portion (if any) of these funds").[34]

---

[33] *See Rust*, 500 U.S. at 198-99 (upholding government's right to issue regulations which required recipients of grants to engage in abortion-related activity separately from activity receiving federal funding); *see also Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983) (holding that Congress could exercise its spending power to prohibit tax-exempt organizations from lobbying because organizations were free to create separate affiliates which could receive private funds to support lobbying efforts); *accord United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) (declining to decide unconstitutional conditions argument but reiterating *Rust*'s teaching that government may insist that public funds be spent for purposes for which they were authorized).

[34] In *Rust*, the governmental regulations at issue did "not force the . . . grantee to give up abortion-related speech; they merely require[d] that grantee to keep such activities separate and distinct from its [government-funded family planning activities]" such that "the . . . *grantee* [could] continue to perform

(continued...)

-51-

Given all this, we are unable to conclude, as defendants would have us, that the relief ORC seeks represents an impermissible form of relief under our received Eleventh Amendment jurisprudence. Of course, at this stage we are confronted only with a motion to dismiss and thus have taken plaintiff's pleadings as true for purposes of our analysis, drawing all inferences in ORC's favor. We offer no comment on whether the ORC will ultimately be able to prove that Oklahoma's statutory scheme is constitutionally infirm. *See Verizon Md.*, 535 U.S. at 646 ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."). And, as with any other legal defense or immunity, should the facts developed in discovery take the case in a direction different from that suggested by the complaint, the trial court remains free to revisit the applicability of the Eleventh Amendment, whether at summary judgment or thereafter. That is, defendants remain free, as discovery progresses, to try to establish facts suggesting that granting ORC the relief it requests would operate to reduce the amount of funds flowing to the state Treasury or otherwise constitute something functionally equivalent to a retrospective judgment. Likewise, we offer no comment on whether any other forms of relief ORC may ultimately seek to add to this suit might or might not be problematic under the

(...continued)
abortions, provide abortion-related services, and engage in abortion advocacy; [the grantee was] simply required to conduct those activities through programs that are separate and independent from the project that receives [government] funds." 500 U.S. at 196.

Eleventh Amendment.  For our current purposes, we need only conclude, as we do, that litigation may proceed on the basis of plaintiffs' amended complaint.[35]

IV

For the reasons explored above, we hold that Oklahoma's specialty license plate charges are "taxes under State law" for the purposes of the TIA and thus affirm the district court's dismissal of claims one through four.  We also hold that the prospective relief sought in this case falls within the scope of *Ex parte Young* and is not barred by the Eleventh Amendment; we therefore reverse the district court's dismissal of claims five and six and remand those claims for further proceedings consistent with this opinion.  *So ordered.*

---

[35] On November 12, 2004, the district court entered a Temporary Restraining Order prohibiting the State from disbursing any monies from the Choose Life Assistance Fund until July 1, 2005.  On July 6, 2005, the parties entered into an Agreed Order pursuant to which the State promised to retain ORC's *pro rata* share of the funds available for distribution from the Choose Life Assistance Fund until the case has been decided on the merits.  We need not decide – and express no views on – whether any disbursement of these funds would be the functional equivalent to an impermissible retroactive money judgment because no party to this appeal challenged the Agreed Order.  All that is now before us is a motion to dismiss the complaint based on the allegations contained therein.