**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 17, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

M.G., a minor and through her mother
Christina Garcia; C.V., a minor, by and
through his father, Jeremy Vaughan;
DISABILITY RIGHTS NEW MEXICO,
INC.,

      Plaintiffs - Appellees,

and

A.C., a minor, by and through her mother
Alicia Cortez,

      Plaintiff ,

v.                                                                        No. 23-2093

Kari Armijo,[*] in her official capacity as
Secretary for the Human Services
Department of New Mexico; HUMAN
SERVICES DEPARTMENT,

      Defendants - Appellants.

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:22-CV-00325-MIS-DLM)**

_____

Patricia G. Williams, Wiggins, Williams & Wiggins, PC, Albuquerque, New Mexico, for
Defendants - Appellants.

---

[*] This court substitutes Kari Armijo as defendant. *See* Fed. R. App. P. 43(c)(2).

Nancy L. Simmons, Law Offices of Nancy L Simmons PC, Albuquerque, New Mexico, for Plaintiffs – Appellees.

_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.

_____

**MURPHY**, Circuit Judge.

_____

## I. INTRODUCTION

M.G. and C.V. are "medically fragile children" for purposes of New Mexico's Medicaid program. *See* N.M. Code R. § 8.314.3.12(B).[1] They sued the New Mexico Human Services Department ("HSD"), asserting HSD consistently fails to provide them with the number of private duty nursing ("PDN") hours to which New Mexico has determined they are entitled.[2] M.G. and C.V. sought a preliminary injunction obligating HSD to take good faith steps to provide them with their entitled level of PDN hours pending the resolution of their suit. The district court granted their requested injunction and HSD appeals.

---

[1] A.C. was a named plaintiff in this suit. She is no longer a party because, as noted by the district court, she died during the pendency of the district court proceedings. Nevertheless, the district court considered evidence relating to A.C. in a limited fashion in determining whether M.G. and C.V. were entitled to a preliminary injunction. Thus, this court briefly recounts A.C.'s background in Section II.A. and considers the evidence relied on by the district court in analyzing whether M.G. and C.V. demonstrated that, absent an injunction, they will experience irreparable injury. *See infra* Section IV.A.2.b.

[2] HSD and its Secretary, Kari Armijo, who was sued exclusively in her official capacity, are referred to collectively as HSD. At the time of the district court proceedings, Dr. David Scrase was HSD's Secretary. Scrase provided evidence in the district court; that evidence is discussed below.

This court exercises jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and **affirms**. We hold as follows: (1) M.G. and C.V. have standing to seek injunctive relief; (2) the district court did not err in concluding M.G. and C.V. established a likelihood of success on the merits of their Medicaid Act claims[3] and did not abuse its discretion in granting injunctive relief; (3) the district court's injunction is not impermissibly vague; and (4) the Supreme Court's decision in *Armstrong v.*

---

[3] In addition to the Medicaid Act, M.G. and C.V. based their request for injunctive relief on the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-01 (1999). *Olmstead* recognized the right of persons with disabilities to participate in the community to the greatest extent possible. This right is known as the "integration mandate." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180-81 (10th Cir. 2003). M.G.'s and C.V.'s *Olmstead* claim arises, without meaningful distinction, under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. *See Fisher*, 335 F.3d at 1179 & n.3. As applied to the facts of this case, the integration mandate has two potential aspects: (1) preventing HSD from providing benefits in a way likely to lead to the institutionalization of M.G. and C.V. and (2) preventing HSD from mandating the provision of PDN hours in the home or school, rather than in a community setting. In analyzing the appropriateness of injunctive relief, the district court concluded M.G. and C.V. were substantially likely to prevail on their claims under *Olmstead*'s integration mandate. Furthermore, the district court considered the integration mandate in deciding whether M.G. and C.V. demonstrated irreparable injury. Notably, however, no part of the district court's preliminary injunction obligates HSD to do anything other than undertake good faith efforts to provide M.G. and C.V. with the PDN hours to which they are entitled. That is, the preliminary injunction does not direct HSD to provide PDN hours to M.G. and C.V. in a community setting. And, as recognized by the district court, M.G.'s and C.V.'s integration-based argument is likely to prevail under the Medicaid Act standing alone. Dist. Ct. Order at 33-34 (citing *Lankford v. Sherman*, 451 F.3d 496, 512 (8th Cir. 2006) and *Skubel v. Fuoroli*, 113 F.3d 330, 337 (2d Cir. 1997)). In its appellate briefing, HSD fails to respond to this aspect of the district court's ruling. Given this, and because the analysis set out below demonstrates the district court's injunction was properly entered solely on the basis of M.G.'s and C.V.'s Medicaid Act claims, this court does not address at this preliminary stage any aspect of M.G.'s and C.V.'s claims based on *Olmstead*'s integration mandate.

*Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), does not foreclose entry of a preliminary injunction in this case.

## II. BACKGROUND

### A. Factual Background[4]

M.G. and C.V. are, and A.C. was, profoundly ill minor children classified as "medically fragile" under New Mexico's Medicaid program. The children's designation as "medically fragile" reflects that each has "a life threatening condition characterized by reasonably frequent periods of acute exacerbation which require frequent medical supervision, or physician consultation and which in the absence of such supervision or consultation, would require hospitalization." N.M. Code R. § 8.314.3.12(B)(1). The children's "life threatening conditions" include, inter alia, difficulty breathing, frequent seizures, and the inability to feed themselves or go to the bathroom unassisted. M.G. and C.V.'s claims arise out of HSD's alleged failure to provide them, in violation of the Medicaid Act, with PDN hours at the level to which they are entitled. That is, they assert that although the mandated review process employed by HSD has budgeted each child with a necessary level of PDN hours, HSD ultimately provides a much smaller number of such hours.

---

[4] This limited factual background section sets out basic information about M.G., C.V., and A.C. and the dispute with HSD that led to the initiation of these proceedings. Additional relevant facts are set out *infra* in Section IV., the portion of this opinion analyzing the arguments raised on appeal.

The Medicaid Act directs federal funding to states, including New Mexico, for the provision of medical assistance to low-income individuals who would not otherwise be able to afford healthcare. *See generally* 42 U.S.C. § 1396. States participating in the Medicaid program must designate a single state agency to administer and supervise the program and ensure compliance with the law. *Id.* § 1396a(a)(5). New Mexico has designated HSD for that purpose. The Medicaid Act requires that a state Medicaid plan furnish, inter alia, PDN services to those living in their home communities, as opposed to uniformly requiring institutionalization for high-need patients. *Id.* §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(a)(8); *see also O.B. v. Norwood*, 838 F.3d 837, 839 (7th Cir. 2016) (summarizing the statutory basis for mandatory provision of PDN hours to medically fragile children). One goal of the Medicaid program is to help disabled individuals to retain the capability for independence. *Id.* § 1396-1.

M.G., a three-year-old girl, suffers from seizures and is dependent on a ventilator and feeding tube. Her mother works as a service coordinator for New Mexico's Developmental Disabilities Waiver program; she has worked in that field for twenty-two years. She adopted M.G. in 2020, after caring for her as a foster parent. M.G.'s mother's full-time employment in public service is at constant risk due to M.G.'s lack of adequate PDN hours. The PDN shortfall creates a need for M.G.'s mother to care for M.G. during normal working hours.

C.V., a three-year-old boy, suffers from medication-resistant seizures and is dependent on a feeding tube. C.V. can have over fifty seizures in a single day. C.V.'s

5

parents, both law enforcement personnel, have submitted, to no avail, repeated requests for PDN services to the managed care organization with whom HSD has contracted to provide these services. C.V.'s parents allege that, due to the lack of PDN hours, they have been unable to earn income with which to better support C.V. C.V.'s mother averred she had to give up a high-level position as a federal agent "to take a lower paying position that provides more flexibility for leave, and has since used up all her earned leave." Due to the deficits in C.V.'s PDN hours, C.V.'s father initially planned to retire early from his position as a state police officer so he could be home with C.V. while his wife worked. He was, however, shot in the line of duty, resulting in "[p]ain in his back, neck and shoulders," which has made it "extreme[ly] difficult[]" to pick up C.V. or attend to his needs. As a result, C.V.'s family is left in ongoing financial and caretaking need.

A.C. was a ten-year-old girl who required "maximum assistance in basic living functions such as feeding, walking, toileting and bathing," and required "regular breathing assessments." She passed away after being hospitalized for a medical emergency. A.C. allegedly experienced "an average shortfall of 23.8 hours [of PDN] per week."

In the absence of adequate PDN hours, M.G. and C.V. are at constant risk of life-threatening medical complications. For example, in the winter of 2022, C.V. lacked coverage for some approved PDN hours. At that time, C.V.'s mother was bottle feeding him and noticed "a runny nose, coughing, and some congestion," which to most parents would indicate a common cold. The condition, however,

6

continued for months. Finally in the summer, a nurse was able to observe C.V.'s condition and recommended a swallow study, which revealed C.V. is unable to safely take food by bottle due to the risk of aspiration (i.e., fluid entering the lungs).

## B. Procedural Background

M.G., C.V., and A.C. filed a complaint in district court on April 28, 2022. As their ninth cause of action, they asserted HSD denied them their statutory right to PDN hours, in violation of §§ 1396a, 1396d. They sought only equitable relief as to the alleged violations of the Medicaid Act.[5] Thereafter, M.G., C.V., and A.C. sought a preliminary injunction ordering HSD "to provide or ensure PDN services." The district court denied the request, concluding the proposed preliminary injunction was impermissibly vague. In response, M.G., C.V, and A.C. filed a revised motion for a preliminary injunction. After considering the parties' arguments, together with voluminous documentary evidence and evidence adduced at two hearings, the district court granted the request.

---

[5] In relevant part, the complaint sought the following relief:

270. Declare in favor of Plaintiffs . . . that HSD Defendants are failing to comply with the requirements of the Medicaid Act . . . ;

271. Issue preliminary and permanent injunctive relief requiring [HSD] to furnish and fulfill authorized private-duty nursing hours, directly or through referral to appropriate agencies, organizations, or individuals, to Plaintiffs . . . ;

In a thorough order, the district court concluded each of the four preliminary injunction requirements weighed heavily in M.G.'s and C.V.'s favor.[6] In so doing, the district court found that HSD's impossibility arguments—arguments predicated on a universal shortage of nurses—failed whether viewed as a merits-based defense or an attack on M.G.'s and C.V.'s standing. The district court concluded the revised request for a preliminary injunction, as further modified by the district court, was not vague. Instead, especially given "the information asymmetry involved in the current case, as well as [HSD's] expertise in administration of the New Mexico Medicaid program," the district court determined the proposed injunction described in reasonable detail the acts HSD was required to undertake. Finally, the district court

---

[6] As noted above, *see infra* n.1, by the time the district court entered the preliminary injunction, A.C. had passed away. Thus, the injunction only applies to M.G. and C.V. In relevant part, the preliminary injunction provides as follows:

> [HSD] shall, in good faith, take additional immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to [M.G. and C.V.] at the level already approved by [HSD], as required by the Medicaid Act, pending final judgment in this action or until further order of the Court. . . . Such steps may include, but are not limited to, negotiation with Managed Care Organization partners regarding possible solutions, making good faith attempts to attract qualified nurses from other states, increased monitoring of [M.G.'s and C.V.'s] weekly shortfalls, or any other administrative or other action which tends to and does actually increase the average number of private duty nursing hours provided to [M.G. and C.V.] each month without seriously compromising other programmatic goals.

Dist. Ct. Order at 44.

concluded the Supreme Court's decision in *Armstrong*, 575 U.S. at 330-31, did not serve as an impediment to the entry of the proposed preliminary injunction.

HSD appeals, challenging each of the district court's relevant findings or conclusions.

### III. STANDING

HSD asserts M.G. and C.V. lack standing because they failed to demonstrate a favorable judicial decision will redress their injuries. "To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but [] must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (quotation omitted).

HSD's justiciability argument is not substantial. Boiled down to its essence, HSD asserts a nationwide nursing shortage renders it impossible to provide all allotted PDN hours to which M.G. and C.V are entitled. Focusing exclusively on reimbursement rates paid to private duty nurses by home health agencies, HSD contends, given the nationwide shortage, there is no record evidence demonstrating a mandated rate increase would result in the provision of additional PDN hours to M.G. and C.V. HSD's argument fails for a plethora of reasons. First, HSD has not identified a single analogous case holding that the issue it raises is one of justiciability, rather than some kind of merits-based impossibility defense. This court recently rejected the notion a similar defense, one based on the significant probability it would be impossible to fashion a remedy that did not violate federal drug laws,

went to the issue of redressability. *Bartch v. Barch*, 111 F. 4th 1043, 1054, 1055 (10th Cir. 2024); *id.* at 1064 n.1 (Baldock, J., dissenting) (agreeing with the majority that this was a merits problem not implicating justiciability). None of the cases cited in HSD's appellate briefing is to the contrary. Instead, those cases involve past harms that were unlikely to reoccur and, thus, could not be remedied by forward-looking injunctive relief. *See, e.g.*, *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 310 F. Supp. 2d 216, 228-29 (D.D.C. 2004) ("It is quite obviously impossible to undo the delays that Plaintiffs experienced in gaining access to the Reagan presidential records, and as explained [above], any future injury Plaintiffs might suffer as a result of the Bush Order is speculative at this point."). This case involves a continuing injury caused by an ongoing allegedly illegal practice on the part of HSD.

Ultimately, however, it is unnecessary to definitively resolve this legal question because HSD's argument fails as a matter of fact. As the district court made clear, *see infra* Section IV.C., HSD is flatly wrong to assert this suit is focused primarily, let alone exclusively, on reimbursement rates for PDNs. Instead, M.G. and C.V. sought a full panoply of remedies to redress HSD's alleged failure to provide them with their full allotment of PDN hours. *See* Dist. Ct. Order at 26 ("[M.G.'s and C.V.'s] 'primary claim' as [Medicaid] beneficiaries is clearly for the life-saving healthcare for which they have been approved. Indeed, [their] proposed preliminary injunction includes absolutely no language regarding reimbursement rates." (record citations omitted)). In granting M.G.'s and C.V.'s request for injunctive relief, the district court did not order HSD to make any rate-based adjustment. Instead, the

district court ordered HSD to take other good faith efforts to "increase the average number of [PDN] hours provided to [M.G. and C.V.] each month." "[T]he ability to effectuate a partial remedy satisfies the redressability requirement." *Uzuegbunam*, 141 S. Ct. at 801 (quotation omitted). Thus, HSD's attempt to make this case about the actions of third parties beyond HSD's control is clearly contrary to the record.

As a final nail in the coffin of HSD's justiciability argument, the district court specifically found it was not, in fact, impossible to increase the number of PDN hours provided monthly to M.G. and C.V. As discussed *infra* in Section IV.A.2.a., this finding is amply supported by evidence in the record. Even assuming HSD's arguments implicate redressability, rather than the merits, which would mean that M.G. and C.V. must shoulder the burden of demonstrating a lack of impossibility, the record leaves no doubt they carried their burden. *See* Dist. Ct. Order at 10 (noting the district court found that "M.G.'s mother was recently successful in finding her child additional nurses when [HSD was] unable (or unwilling) to do so"). After all, as long as the record supports the conclusion additional efforts on the part of HSD to live up to its obligations under the Medicaid Act would result in the provision of at least one additional incremental PDN hour to M.G. and C.V., they have satisfied their obligation to demonstrate redressability. Thus, even setting aside serious questions as to whether HSD's argument implicates justiciability, its standing argument fails as a matter of fact.

## IV. ANALYSIS

### A. Entitlement to Injunctive Relief

#### 1. Standard and Standard of Review

Plaintiffs seeking a preliminary injunction must establish (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (quotation and citation omitted). When a proposed injunction is mandatory rather than prohibitory, as is the case here, "such an injunction should be even more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is certainly extraordinary." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 979 (10th Cir. 2004) (en banc).[7]

---

[7] HSD seems to suggest, at pages eight to fifteen of its opening brief, that the district court did not employ the heightened standard applicable to disfavored preliminary injunctions (i.e., those that alter the status quo, are mandatory, or afford a movant all the relief the movant could obtain after a full trial on the merits). *See O Centro Espirita*, 389 F.3d at 975 (describing the three types of "disfavored preliminary injunctions"). This assertion is clearly belied by the district court order, which explicitly states: "The Court thus finds that [M.G.'s and C.V.'s] proposed preliminary injunction is clearly mandatory. Therefore, [they] must meet a heightened burden to show their entitlement to relief." Dist. Ct. Order at 7-8.

"The grant of a preliminary injunction is within the sound discretion of the district court." *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998); *see also Meccano, Ltd. v. Wanamaker*, 253 U.S. 136, 141 (1920) ("The correct general doctrine is that whether a preliminary injunction shall be awarded rests in sound discretion of the trial court. Upon appeal, an order granting or denying such an injunction will not be disturbed, unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion."). This standard applies even to the district court's tentative nonlegal conclusions as to likelihood of success on the merits. *Oklahoma v. U. S. Dep't of Health & Human Servs.*, 107 F.4th 1209, 1216 (10th Cir. 2024). The district court's underlying factual findings are reviewed for clear error. *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).

### 2. Merits

#### a. Likelihood of Success

M.G.'s and C.V.'s complaint and associated request for a preliminary injunction assert that HSD is violating the early and periodic screening, diagnostic and treatment ("EPSDT") provisions of the Medicaid Act in denying them PDN hours to which HSD has already determined they are entitled. The Medicaid Act directs federal funding to states to provide medical assistance to individuals who would not otherwise be able to afford healthcare. *See* 42 U.S.C. § 1396. Participation in the program is voluntary but, if a state chooses to participate, it must comply with the Act's requirements, including federal criteria governing what services must be

13

provided. *See infra* n.20. States participating in Medicaid must designate a single state agency to administer and ensure compliance with the law. 42 U.S.C. § 1396a(a)(5). The chosen state agency may not delegate to others its "authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e).

New Mexico participates in the Medicaid program and HSD is the designated agency. HSD does not provide health services or payments directly to beneficiaries but, instead, contracts with managed care organizations ("MCOs") to provide services. *See Starko, Inc. v. N.M Human Servs. Dep't*, 333 P.3d 947, 949-51 (N.M. 2014) (explaining the operation of New Mexico's Medicaid system). The Medicaid Act requires that a state plan furnish healthcare services "with reasonable promptness to all eligible individuals," including PDN services to those living in their home communities, as opposed to uniformly requiring institutionalization for high-need patients. 42 U.S.C. §§ 1396a(a)(8), 1396d(a)(8). Indeed, one of the goals of the Medicaid program is to help people with disabilities "retain [the] capability for independence." *Id.* § 1396-1.

A brief and helpful summary of the statutory basis for the mandate that participating states provide PDN services to medically fragile children is set out by the Seventh Circuit in *O.B.*:

> The Act defines "medical assistance" as including "early and periodic screening, diagnostic, and treatment services [EPSDT] . . . for individuals . . . under the age of 21," . . . 42 U.S.C. § 1396d(a)(4)(B), and requires the state to "mak[e] medical assistance available" to all eligible individuals. § 1396a(a)(10)(A). A related provision,

14

§ 1396a(a)(43)(C), requires the state to "provide for . . . arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services." (Corrective "treatment" is "T" in the acronym "EPSDT.") Another provision, 42 U.S.C. § 1396a(a)(8), requires that medical assistance "shall be furnished with reasonable promptness to all eligible individuals."

One of the EPSDT treatment services is "private duty nursing services," 42 U.S.C. § 1396d(a)(8) . . . ; it means that the child lives at home rather than in a hospital or other medical-care facility and is attended by a nurse or series of nurses for the number of hours allowed by [the agency].

838 F.3d at 839; *see also Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232-38 (11th Cir. 2011) (providing an exhaustive summary of the statutory and regulation system governing the provision of PDN services to medically fragile children).

The district court concluded M.G. and C.V. were likely to prevail on their claim HSD is violating the provisions of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), and 1396d(a)(4)(B)[8] by not providing to them all the PDN hours to which HSD has determined they are entitled. Aside from HSD's argument's relating to *Armstrong* discussed below, *see infra* Section IV.C., the district court made two key rulings HSD challenges on appeal. First, the district court found that M.G. and

---

[8] In its appellate briefing, HSD argues at length that 42 U.S.C. § 1396a(a)(8), which requires that medical assistance like EPSDT services be furnished with reasonable promptness, does not support the issuance of the district court's preliminary injunction. In issuing the preliminary injunction, however, the district court specifically declined to "address [M.G.'s and C.V.'s] likelihood of success under [§ 1396a(a)(8)] of the Medicaid Act." Dist. Ct. Order at 23. Accordingly, the question whether § 1396a(a)(8) could support the district court's injunction is not before this court and we decline to address the issue.

C.V. had proven they were entitled to the number of PDN hours set out in EPSDT budgets developed by New Mexico. Second, the district court found HSD had not demonstrated it was impossible to provide to M.G. and C.V. the full allotment of hours it had already determined they were entitled to receive, let alone provide them with at least a few more hours than it was currently providing. HSD has not demonstrated the district court's findings in these regards are clearly erroneous.[9]

The district court did not err in finding, as a preliminary matter, that the number of PDA hours set out in each child's EPSDT budget is the number of hours HSD has determined are medically necessary. Margaret Agard, a former registered nurse case manager in New Mexico, testified at length regarding New Mexico's process to develop a medically fragile child's EPSDT budget. She stated that the documents making up the Level-of-Care packet, and New Mexico's ultimate approval of a particular Level of Care, satisfy the criteria for medical necessity. The medically

_____

[9] Our reading of HSD's appellate likelihood-of-success arguments being directed to M.G.'s and C.V.'s factual entitlement to more hours than HSD is currently providing is consistent with the district court's interpretation of HSD's arguments below. The district court explicitly noted HSD did not "even begin to argue that [§§ 1396a(a)(10)(A), 1396d(4)(B), and 1396a(a)(43)(C)] of the Medicaid Act are judicially unenforceable or that Congress implicitly precluded private enforcement of these sections, and these potential arguments are thus waived." Dist. Ct. Order at 25. Instead, the district court interpreted HSD's arguments as focusing on whether M.G. and C.V. sufficiently asserted their own entitlement to Medicaid benefits as a factual predicate. Notably HSD fails to challenge on appeal the district court's waiver ruling. And, in any event, the district court nonetheless ruled that Medicaid beneficiaries entitled to EPSDT benefits do have a private right of action under the framework set out by this court in *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1224-29 (10th Cir. 2018). HSD has also not challenged that ruling on appeal.

16

fragile child's level of care is ultimately incorporated into an EPSDT budget. According to Agard, this process accounts for "doctors' notes or medical notes in [the child's] chart"; relevant medical issues, including medication administration, number of annual doctor visits, how the child receives nutrition, and the child's respiratory and neurologic status; and "if [the medically fragile child has] any complex medical procedures that are done on a daily basis." This "Level-of-Care" assessment is then submitted to Qualis[10] for "final eligibility determination for the program," including "a long-term care assessment abstract . . . that's a one-page document that the physician signs . . . [,] a health systems review document, which is another document the physician signs[,] . . . medical records[, and] an up-to-date history and physical from the physician that outlines the complexity of care." "The [EPSDT] budget [is] sent to the MCO for prior authorization."[11]

---

[10] Qualis operates as a third-party assessor for HSD. *Johnson v. N.M. Human Servs. Dep't*, No. A-1-CA-36993, 2021 WL 72184, at *2 (N.M. Ct. App. 2021). "The Third-Party Assessor . . . or the Department's Medical Assistance Division . . . is responsible for approving the [service and support plan] and authorizing the annual budget." *Id.* at *1.

[11] As noted by M.G. and C.V., the district court relied on documents relating to the children's attempts to get the MCOs to provide the number of allotted PDN hours in concluding they "produced voluminous credible evidence . . . they are consistently not receiving their required hours." Dist. Ct. Order at 12. At no point did the MCOs deny that M.G. or C.V. were entitled to the PDN hours set out in the EPSDT budgets. Instead, they simply responded that they were working to attract additional nurses. M.G. and C.V. argue convincingly that the for-profit MCOs have every incentive to contest the duty to provide medically unnecessary PDN hours. The approvals of the EPSDT budgets and failures to contest their obligations to provide PDN hours at those levels when the children attempted to administratively grieve shortfalls, supports the district court's findings of fact. *See Starko*, 333 P.3d at 952 ("The managed care system is a risk-based system, meaning an MCO bears the risk of loss

In response, HSD simply asserts Agard admitted parents of medically fragile children have some ability to override medical necessity decisions as part of the EPSDT budgeting process. The district court, however, was not compelled to read Agard's testimony as supporting that assertion. Indeed, during her testimony, Agard clarified comments she made in a deposition and, by doing so, rejected HSD's assertion parents were making medical necessity determinations: "Q. Families, case managers, and the nursing agencies determine the hours and needs for a child, correct? A. No. The hours are determined through the Level of Care, so that eligibility is determined when Qualis approves them at a certain level. Once we know which level, then we can discuss how to allocate those hours within that level." Agard's testimony is corroborated by the testimony of Michelle German, a Location Director at Thrive Skilled Pediatric Care ("Thrive"). She testified she relies on the EPSDT budgets of each of Thrive's clients, including M.G. and C.V., because it is "always important to know how many hours a child qualifies for and also their utilization." German also testified M.G. and C.V. appeared on Thrive's internal lists of patients that had not been able to obtain all the PDN hours to which they were entitled.

HSD also relies on the testimony of then HSD Secretary, Dr. David Scrase. Scrase averred that M.G.'s and C.V.'s PDN hours, even though allotted in their

---

if the State's fee does not cover all the costs for the healthcare that the Medicaid program requires MCOs to provide to individuals.").

EPSDT budgets, were not medically necessary because much of the care they needed could be performed by a home health aide. Scrase did not, however, account in any way for the EPSDT budgeting process or explain how the system could work on the ad hoc basis he used to determine medical necessity. Again, the district court was not compelled to credit Scrase's testimony over the other record evidence identified in the district court order. The district court did not err in finding, as a preliminary matter, that M.G. and C.V. proved they were entitled to the number of PDN hours set out by the state approved EPSDT budget.[12]

Nor did the district court clearly err in concluding HSD failed to preliminarily establish it was impossible to undertake a good faith effort to provide to M.G. and C.V. PDN hours at the level set out in their EPSDT budgets. *See* Dist. Ct. Order at 34

---

[12] This court notes that the district court left open the door to further challenges by HSD as to the medical necessity of PDN hours set out in M.G.'s and C.V.'s EPSDT budgets. The district court ruled as follows:

> [Based on the evidence presented,] there will be a rebuttable presumption of entitlement to the PDN hours specified in the EPSDT budget. Such presumption may be rebutted by good cause shown, including, for example, an affidavit by the care manager that PDN services are not medically necessary for a given child at the level represented by the EPSDT budget, an affidavit showing increased need in between regular periodic assessments, or other changed circumstances. In the event that one side seeks to rebut this presumptive entitlement, the other side will have the right to submit evidence in their favor in reply, including, for example, provider testimony. The Court reserves the right to update this determination at any time as the case proceeds.

Dist. Ct. Order at 32. M.G. and C.V. note that at the time of the filing of their response brief, HSD has made no such challenge.

("[T]he . . . injunction does not require perfect compliance with the EPSDT mandate; it requires good faith efforts."); *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 167 (4th Cir. 2024) (recognizing the Medicaid Act "is an example of a substantial compliance statute"); 42 C.F.R. § 440.230(b) (requiring that a state's provision of a required EPSDT benefit, such as PDN services, "must be sufficient in amount, duration, and scope to reasonably achieve its purpose"). As noted by the district court, HSD's own, self-professed efforts to ameliorate the shortage of nurses undercuts the notion no steps exist that will combat the shortage. HSD's assertion on appeal, *see* HSD Opening Br. at 28, that it "has taken steps to address the shortage of PDN services in the in-home setting" likewise undercuts its impossibility argument. Furthermore, the district court noted its injunction only covers two medically fragile children, not a class of all New Mexico medically fragile children, rendering HSD's arguments about national markets and macroeconomic conditions mostly superfluous. Indeed, there is absolutely no evidence in the record it would be difficult, let alone impossible, to provide M.G. and C.V., as opposed to some grander class of Medicaid beneficiaries, with their allotted PDN hours.

Most importantly, the district court did not err in concluding two concrete steps identified in the preliminary injunction could possibly lead to the provision of additional PDN hours to M.G. and C.V. First, the district court suggested HSD could at least partially satisfy its required good faith effort by collecting accurate information about whether MCOs are providing M.G. and C.V. the PDN hours set out in the EPSDT budgets. Dist. Ct. Order at 44 (noting a step HSD can take to

20

comply with the injunction in good faith is to "increase[] monitoring of [M.G.'s and C.V.'s] weekly shortfalls"); *see also id.* at 40 ("Despite the passage of months, however, the answers to various essential questions in this case remain mysterious—whether traveling nurses could solve [M.G.'s and C.V.'s] shortfalls or not, the feasibility of attracting nurses from out of state, and why [M.G.'s and C.V.'s] parents are periodically able to solve the staffing problem themselves while [HSD is] not."). Scrase testified that HSD was operating without sufficient data about shortfalls to know whether the MCOs were providing all required hours. *But see* 42 C.F.R. § 438.206(b) (requiring states to ensure through its contracts, that the MCOs monitor their networks to assure the networks are sufficient to provide all covered services and, if the network is not sufficient, to timely and adequately cover those services out of network). Scrase's testimony as to lack of information is corroborated by German's testimony. She testified Thrive produced internal reports about PDN shortages as to each of its clients, including M.G. and C.V. German testified that neither HSD nor any of HSD's MCOs had ever asked for copies of those reports.

This brings this court to the district court's second concrete step that, if taken in good faith, could lead to the provision of additional PDN hours to M.G. and C.V. It is uncontested that the contracts HSD entered into with the MCOs serving M.G. and C.V. are risk-based contracts requiring those MCOs to provide all services necessary, specifically including PDN hours, even if they must do so at a loss. *See Starko*, 333 P.3d at 952. As the district court noted, there is no indication in the record that HSD has engaged in any effort to work with MCOs to assure they are

living up to their contractual obligations. Instead, Scrase testified that because of a lack of information, HSD was not sure the MCOs were in breach. In response to Scrase's testimony, the district court asked him the following question: "So your position is you've done nothing because you still, as of today, do not know that these children are not getting some of the nursing hours they've been approved for? Is that your position?" In response, Scrase testified M.G. and C.V. were not getting their allotted hours and "we" could make sure they get their allocation.[13] Given all the

---

[13] The relevant part of the colloquy is as follows:

[Scrase]: No. I believe that we're not up to the full allocation of private duty nurses. I think we could get up to the full allocation of hours. I think that's possible, but I understand, particularly, you know, we have one of the kids who is getting all home health right now and another that's getting all Private Duty Nursing. So it's not the position that they're not getting it, it's that we—you know, this is—we got the Complaint. My attorneys have been working on this, trying to establish the facts in the case. And when those are clearly established, we're happy to move forward to resolve them.

THE COURT: What do you need for them to be clearly established? I mean, the plaintiffs have laid it out; the MCOs, presumably, have this actual data for you. When you say you want it clearly established, what do you mean?

THE WITNESS: I did not—so the data we submitted to you, Your Honor—

THE COURT: Yeah.

THE WITNESS:—with the average number of hours for the two children we're talking about today, that data, I first saw on—which I think is persuasive and it convinced me that we need to do more for the kids to get them these Services . . . .

22

record evidence, the district court did not clearly err in determining HSD failed to establish impossibility.

Each of the key facts undergirding the district court's likelihood-of-success determination challenged by HSD on appeal is supported by the record. Furthermore, this court's extensive review of the record leaves us with no doubt the district court acted within its discretion in determining M.G. and C.V. are substantially likely to prevail on the merits of their Medicaid Act claim.

### b. Irreparable Injury

The district court undertook a thorough and searching analysis of the question whether M.G. and C.V. demonstrated the existence of irreparable injury absent entry of a preliminary injunction. As relevant here, the district court first found M.G. and C.V. "made an incredibly strong showing" of irreparable and immediate medical harm in absence of preliminary relief. By the very dint of their uncontested designation as "medically fragile," M.G. and C.V. each has "a life threatening condition characterized by reasonably frequent periods of acute exacerbation which require frequent medical supervision, or physician consultation and which in the absence of such supervision or consultation, would require hospitalization." N.M. Code R. § 8.314.3.12(B)(1). Furthermore, according to the district court, M.G. and C.V. each "demonstrated a high likelihood of irreparable injury in the absence of appropriate medical care." The record reveals "M.G. has a tracheostomy to maintain

---

HSD App. at 512-13.

a clear airway, gastrostomy port in her stomach to receive fluids and nutrition, and is dependent on the use of a ventilator at home." C.V. relies on a gastronomy tube and averages "over 50 seizures a day." C.V. relies on the presence of a "skilled person available to provide emergency services and rescue medications." As a tangible example of the medical complexity inherent in M.G.'s and C.V.'s conditions, the district court noted C.V.'s inability to bottle feed without aspirating went undetected by C.V.'s parents for an extended period. The condition was only eventually recognized by a PDN. Likewise, all the original plaintiff children experienced intermittent hospitalizations during the pendency of the case in district court. And, tragically, A.C., who allegedly suffered an average shortfall of 23.8 PDN hours per week, died while the case was pending in the district court. Finally, and critically, the district court found M.G. and C.V. "produced voluminous credible evidence in the form of affidavits, testimony, and documentation from [HSD's] own MCO partners that they are consistently not receiving their required hours."

On appeal, HSD challenges only one narrow aspect of the district court's analysis of irreparable injury. It asserts M.G. was receiving all the PDN hours to which she claims she was entitled at the time of entry of the preliminary injunction and, therefore, she failed to establish the existence of irreparable injury. In so arguing, HSD emphasizes that the "purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quotation omitted). And, according to HSD, the

24

declaration executed by M.G.'s mother on September 27, 2022, demonstrates that M.G. was then receiving eighty-four of eighty-four allotted PDN hours.[14]

HSD has not demonstrated the district court clearly erred in finding M.G. and C.V. are consistently not receiving their allotted PDN hours. *See Tyson Foods*, 565 F.3d at 776 (holding that on review of the grant or denial of a preliminary injunction, the district court's underlying factual findings are reviewed for clear error). HSD does not challenge the district court's finding that C.V. consistently received less than his allotted number of PDN hours. The record evidence relied on by the district court demonstrates that since C.V.'s qualification as a medically fragile child, his parents "have struggled to get consistent [PDN] hours filled." PDN staffing has always been inconsistent, with "some months where the hours are fully staffed but then several months with significantly less staffing." At the time C.V.'s mother filed her declaration on September 21, 2022, C.V. was only receiving approximately twenty-six of his forty-six allotted PDN hours.

HSD's arguments are no better as to M.G. It is certainly true, as HSD notes, that at the time of the filing of M.G.'s mother's September 27 declaration, M.G. was receiving all of her allotted PDN hours. The declaration also makes clear, however, the exceptional nature of that state of affairs. M.G. qualified as a medically fragile

---

[14] The bulk of HSD's briefing on the issue of irreparable harm sets out and then attacks a strawman. It asserts a class wide injunction is not proper because no class has been certified. The district court's injunction, however, applies only to M.G. and C.V.

child in 2019. According to the declaration "[p]rior to September 2022, [M.G.] has typically not been able to access all of the hours of [PDN] that she requires. For instance, for the majority of 2021, M.G. was able to access only half or less of the [PDN] hours that she needs and qualifies for." And, as recognized by the district court but ignored by HSD, M.G.'s mother filed a follow-up declaration on February 21, 2023. The follow-up declaration revealed that within a month of the filing of the previous declaration, the provision of PDN hours returned to the historically unfortunate norm of irregularity. Furthermore, at an evidentiary hearing on M.G.'s and C.V.'s request for a preliminary injunction held on May 18, M.G.'s mother testified that although M.G. was then allotted 112 PDN hours per week, the most hours M.G. had received during the month was approximately sixty-six hours.

In summary, the record fully supports the district court's finding that M.G. and C.V. have consistently not received the PDN hours to which they are entitled and that, absent issuance of a preliminary injunction, they will experience the same state of affairs during the pendency of the litigation. Furthermore, HSD has not challenged, and the record fully supports, the district court's finding that a continued shortage of allotted PDN hours will very likely subject M.G. and C.V. to medical harm, institutionalization, or death. The existence of this likely and imminent irreparable harm, coupled with M.G.'s and C.V.'s showing of likelihood of success on the merits of their Medicaid Act claim, strongly supports the district court's decision to grant M.G. and C.V. interim injunctive relief. *See Delaware State Sportsmen's Assoc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194,

201 (3d Cir. 2024) (holding that a showing of irreparable harm is more likely to support the issuance of preliminary relief when the potential harm is the movant's death and that death would prevent the court granting an effective remedy upon the litigation's conclusion).

### c. Balance of Harms

The district court concluded M.G. and C.V. demonstrated their threatened injuries—risk of immediate medical harm, institutionalization, and possible death—outweighed any potential injury to HSD in complying with a preliminary injunction. The district court began by noting HSD waived any argument by failing to adequately brief the issue. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . ."). The entirety of HSD's district court briefing of the issue consisted of a single-sentence paragraph, which focused exclusively on the existence of irreparable harm.[15]

In any event, even setting aside HSD's waiver and balancing the equities sua sponte, the district court ruled the record demonstrated the threatened injury to M.G.

---

[15] That sentence/paragraph, which is quoted at pages seventeen and eighteen of the district court order, reads as follows:

> Because Plaintiffs have not shown irreparable harm, the Court need not engage in a balancing test to determine whether the cost and disruption to HSD of trying to comply with an impermissibly vague injunction . . . that does not guarantee any actual services for Plaintiffs (since HSD cannot create nurses and paying nurses more to serve the named Plaintiffs takes away nursing services from someone else) is outweighed by the harm to Plaintiffs.

Dist. Ct. Order at 17-18.

27

and C.V. "greatly outweighs" any possible injury to HSD. This was true, the district court concluded, because (1) M.G. and C.V. demonstrated both the likelihood and magnitude of harms they would likely suffer if HSD continued to deny them their allotted PDN hours and because (2) they carried their burden of establishing the Medicaid Act entitled them to the allotted hours. HSD, on the other hand, failed to demonstrate that providing additional PDN hours to M.G. and C.V. was impossible or disruptive to New Mexico's Medicaid system. Finally, the district court concluded the potential harm to HSD, at best, was small because the burden of providing the allotted PDN hours was imposed by the Medicaid Act, not by an injunction. *See Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) ("Because the defendants are required to comply with [the analogous federal] Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them. The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it."). This was especially true, the district court determined, because New Mexico's participation in the Medicaid program was entirely voluntary and the record revealed that New Mexico receives three federal dollars for every dollar it spends on Medicaid.

In its opening brief on appeal to this court, HSD ignores the district court's ruling entirely, both as to waiver and the balance of harms. Instead, it merely repeats verbatim, with the exception of replacing a few parentheses with commas, the single-

28

sentence argument it advanced in its district court briefing.[16] HSD's failure to grapple with any aspect of the district court's ruling on the balance of harms amounts to a waiver of the issue. *See* Fed. R. App. P. 28(a)(8) (requiring an appellant to sufficiently argue the issues it seeks to appeal); *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1226 (10th Cir. 2009) (holding that an argument "insufficiently raised" in a party's brief is "deemed waived"). The result is this court concludes the district court did not abuse its discretion in ruling that the balance of harms heavily favored the issuance of M.G.'s and C.V.'s requested injunction. The district court's conclusion satisfies the "strong showing" this court requires as to the balance of

---

[16] HSD adds the following two sentences to round out its three-sentence argument on appeal:

> The injunction puts HSD in the position of considering rationing care to New Mexicans, reducing eligibility hours by regulation systemwide or pulling PDN services from other patients who are not subject to the requirements of the injunction. HSD does not want to do any of these things but cannot allow itself to be in contempt of the injunction.

HSD's Opening Br. at 23. It is ironic HSD is concerned about rationing care. The district court concluded M.G. and C.V. were likely to prevail on the merits of their claim that HSD was systematically "rationing care" to them by providing less than their allotted PDN hours. More to the point, however, these two additional sentences do not save HSD from waiver. HSD does not cite to the record for factual support for these assertions and, more importantly, does not take into account the district court's likelihood-of-success-on-the-merits and tailoring analyses. The district court, via these analyses, found HSD's impossibility argument was factually faulty and ruled the injunction could not be read to obligate HSD to undertake any rationing or shuffling of current nursing resources. This court affirms those rulings. *See supra* Section IV.A.2.a; *infra*. Section IV.B.

harms for the issuance of a mandatory injunction. *See O Centro Espirita*, 389 F.3d at 976, 980 & n.2.

### d. Public Interest

The district court concluded the requested preliminary injunction would not be adverse to the public interest. It began by recognizing the magnitude of the potential harm absent entry of preliminary relief and the irreparable nature of that harm. In response, HSD asserted "judicial interference with the administration of the New Mexico Medicaid program is counter to the public interest as the planning and commitment of healthcare resources is 'peculiarly within the province' of HSD." HSD further argued, because there existed a shortage of nurses, granting M.G.'s and C.V.'s requested preliminary injunction could limit services to other Medicaid beneficiaries. The district court rejected HSD's public-interest argument as to rationing for the same reasons it found HSD's merits-based impossibility arguments wanting.[17] The district court recognized New Mexico's "concerns regarding its autonomy and expertise in the state healthcare sector" were meaningful. For that reason, the district court tailored the preliminary injunction in such a way as to preserve as much discretion as possible for HSD in complying with the injunction's

---

[17] In particular, the district court emphasized HSD had "not presented a cost study showing that providing nurses for two children would bankrupt the state of New Mexico or even that it would be a substantial burden on the budget of HSD, thus potentially threatening the care of other equally needy patients." On the contrary, HSD's counsel "appeared to admit that hiring traveling nurses to staff state hospitals may free up EPSDT-qualified nurses for home care positions, suggesting that there may already be mechanisms in place to provide relief."

terms.[18] So tailored, the district court ruled that the preliminary injunction was consistent with the public interest.[19]

Although introductory portions of HSD's opening brief on appeal appear to indicate HSD is challenging the district court's public interest determination, *see* HSD Opening Br. at 2, 7, no analysis of the issue appears in the merits section of HSD's brief. Indeed, the term "public interest" does not appear again in any substantive discussion in HSD's opening brief after the one sentence assertion in the "Summary of the Argument" that "[t]he injunction is contrary to the public interest." *Id.* at 7. Unsurprisingly, given this state of affairs, M.G. and C.V. do not address the issue in their response brief. Because HSD did not adequately raise the issue in its

---

[18] The district court explained as follows:

> The Court is unwilling to craft relief which may mandate removal of nurses from other equally urgent duty stations, such as other New Mexico children requiring PDN hours, nursing homes or intensive care units. To do so would be to pit equally situated New Mexican patients against each other on the basis of who filed first. The Court is also uneager to usurp [HSD's] role[] in determining the best use of [its] limited resources. The Court does not presume to tell [HSD] how to perform the day-to-day administration of the state Medicaid program; the Court is merely in the position of being obligated to enforce compliance with the federal Medicaid Act to ensure provision of services to the neediest beneficiaries of [HSD's] programs. The Court has therefore tailored [M.G.'s and C.V.'s] proposed preliminary injunction to allow [HSD] maximum discretion.

Dist. Ct. Order at 41-42.

[19] HSD asserts on appeal that the district court's maximum-discretion-preserving preliminary injunction is too vague for purposes of Fed. R. Civ. P. 65(d). As set out below, HSD's vagueness argument lacks merit. *See infra* Section IV.B.

31

opening brief, any challenge to the district court's public interest decision is waived. *SCO Grp.*, 578 F.3d at 1226. Although HSD does briefly address the issue in its reply brief, we do not generally consider arguments developed for the first time in a reply brief. *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("[T]o allow an appellant to raise new arguments [in a reply brief] would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response." (quotation omitted)).

Even if this court were to disregard HSD's waiver, we would easily conclude the district court did not err in ruling M.G.'s and C.V.'s preliminary injunction is not adverse to the public interest. Referencing M.G.'s and C.V.'s district court arguments regarding the balance of harms—i.e., that HSD is not substantially burdened by the preliminary injunction because it only obligates HSD to do what is already required by the Medicaid Act—HSD's reply brief asserts it "cannot identify sufficient PDNs to provide all the PDN hours approved or what [it] will be forced to do in the absence of those nurse[s] in light of the injunction. This is the applicable analysis for what constitutes the public interest." HSD's Reply Br. at 10-11. This assertion, unfortunately, completely ignores the district court's analysis. The district court order makes clear HSD is not required to shift resources away from other Medicaid beneficiaries in an effort to provide extra hours to M.G. and C.V. Furthermore, the district court specifically found HSD had not produced any evidence that providing already allotted PDN hours to M.G. and C.V. would impose either (1) a financial hardship on New Mexico or (2) an untoward intrusion on HSD's administration of its

Medicaid system. When coupled with the district court's findings and conclusions as to M.G.'s and C.V.'s substantial likelihood of success on the merits[20] and its findings as to the likelihood and magnitude of irreparable injury to M.G. and C.V., it cannot be reasonably argued that the district court abused its discretion in concluding its preliminary injunction was not adverse to the public interest.

### e. Conclusion

HSD has not identified any legal errors on the part of the district court and has failed to demonstrate any challenged district court finding of fact is clearly erroneous. The district court did not abuse its discretion in concluding the four preliminary injunction factors weigh heavily enough in M.G.'s and C.V.'s favor to

---

[20] Although likelihood of success on the merits and the public interest are not coterminous, the first certainly has a bearing on the second in a case such as this one:

> Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions. This means that the federal government will share a state's cost of providing medical care to residents who [cannot] afford it, but only if the state complies with the Medicaid Act's requirements, including federal criteria governing matters such as who receives care and what services are provided at what cost.

*Planned Parenthood of Kansas*, 882 F.3d at 1224 (quotations and citation omitted). Thus, having concluded M.G. and C.V. made a strong showing they are likely to prevail on their claim the Medicaid Act compels HSD to provide them with all PDN hours it has, itself, determined they are entitled to receive, and having found it is not impossible to do so, the district court started on firm ground in analyzing the public interest. It fortified its decision by finding the fiscal impact on New Mexico flowing from the injunction was, in the grand scheme, minimal and by tailoring the injunction to alleviate concerns about interference in HSD's administrative and technical expertise.

support the issuance of a mandatory injunction. Thus, HSD's challenge to the district court's entry of preliminary injunctive relief fails.

## B. Vagueness

Fed. R. Civ. P. 65(d) requires that "[e]very order granting an injunction" must "state its terms specifically[] and [] describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Injunctions simply requiring defendants to obey the law are too vague. *Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009). This is so because such injunctions do not adequately inform a defendant of its obligations. *Swift & Co. v. United States,* 196 U.S. 375, 401 (1905); *see also Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996).[21] To satisfy Rule 65(d), the language of a preliminary injunction must be specific enough for the court to determine whether the defendant is complying. *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 605-06 (10th Cir. 2008).

---

[21] HSD relies heavily on *Hughey* in asserting the district court's preliminary injunction is impermissibly vague because it merely mandates that HSD comply with the Medicaid Act. HSD's attempt to analogize this case to the facts of *Hughey* simply does not hold water. The injunction in *Hughey* was limited to the following: "Defendant shall not discharge stormwater into the waters of the United States from its development property in Gwinnett County, Georgia, known as Rivercliff Place if such discharge would be in violation of the Clean Water Act." 78 F.3d at 1531 (emphasis omitted). In this case, as explained below, the district court operated in an environment in which HSD had superior information as to potential flexibility in resource deployment and recruitment, worked to preserve HSD's ability to bring its administrative and technical expertise to bear, recognized HSD asserted it had already undertaken steps to remedy the PDN shortfalls, and set out specific steps HSD could take to comply in good faith with the injunction. The preliminary injunction here is nothing like the stark injunction at issue in *Hughey* that ordered defendant not violate the Clean Water Act.

Nevertheless, as HSD recognizes in its reply brief, the district court has broad power to deal with unique intricacies of each case, "for breadth and flexibility are inherent in equitable remedies." *See United States v. Paradise*, 480 U.S. 149, 183-84 (1987).

HSD asserts the district court's preliminary injunction does not adequately inform it of its obligations. Instead, according to HSD, the preliminary injunction lacks specificity because it does "not suggest how HSD can produce or acquire more suitably skilled nurses, acceptable to the specific needs of M.G. and C.V." HSD Opening Br. at 39. In like vein, HSD asserts the injunction is "impermissibly vague because it essentially orders HSD to solve a complex problem of labor supply and demand, and medical economics, without providing any concrete instructions for accomplishing the task." *Id.* at 40

Considering all the facts and surrounding circumstances, HSD's vagueness argument is not convincing. In contrast to HSD's assertion, the district court's preliminary injunction sets out specific steps HSD can take in good faith to provide additional PDN hours to M.G. and C.V. Such steps include negotiation with HSD's MCO partners, making good faith attempts to attract qualified nurses from other states, and increased monitoring of M.G.'s and C.V.'s weekly shortfalls. *See supra* n.6. As discussed above, *supra* Section IV.A.2.a., the district court did not err in concluding these steps are a meaningful rejoinder to HSD's claim of impossibility. The preliminary injunction gives HSD flexibility in undertaking those efforts by specifically noting HSD need not "seriously compromis[e] other programmatic

goals" in undertaking its good faith efforts to comply. Dist. Ct. Order at 40.[22] And,

importantly, the district court made clear that those required good faith efforts did not

mandate the shifting of nursing resources away from other Medicaid beneficiaries.

Moreover, as HSD asserts in its opening brief on appeal, it "has taken steps to

address the shortage of PDN services in the in-home setting." HSD Opening Br. at

28; *see also* Dist. Ct. Order at 10 ("[HSD] also admit[s] [it] ha[s] taken various steps

to attempt compliance, even in the face of the nursing shortage."). Given an identical

state of affairs, the Seventh Circuit rejected the notion that an even less specific

injunction was impermissibly vague. *O.B.*, 838 F.3d at 840, 842; *see also id.* at 843-

44 (Easterbrook, C.J., concurring).[23] Finally, the district court recognized it was

---

[22] This court has specifically concluded accounting for such matters in an injunction's mandate is reasonable in a sufficiently complex case. In *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 669 (10th Cir. 1990), this court held that an injunctive prohibition against a school district continuing an illegally segregated school system, "though stated in general terms" was "not objectionable." Instead, the injunction amounted to

> a commendable attempt to give the [district] more freedom to act within the confines of the law. We recognize the difficulty in drafting an injunction that will allow the district maximum latitude in formulating policies, while at the same time making the injunction sufficiently specific. The degree of specificity necessary may be determined in light of the difficult subject matter.

*Id.*

[23] The operative injunction in *O.B.* obligated the relevant Illinois agency to "take immediate and affirmative steps to arrange . . . corrective treatment of in-home shift nursing services to . . . Medicaid-eligible children under the age of 21 . . .who also have been approved for in-home shift nursing services, but who are not receiving those services at the level approved by [the agency], as required by the Medicaid Act." 838 F.3d at 840 (alteration omitted). Although Illinois asserted the injunction

acting in the context of what it termed "information asymmetry." Dist. Ct. Order at

40 ("Despite the passage of months . . . , the answers to various essential questions in

this case remain mysterious—whether traveling nurses could solve [M.G.'s and

C.V.'s] shortfalls or not, the feasibility of attracting nurses from out of state, and why

[M.G.'s and C.V.'s] parents are periodically able to solve the staffing problem

themselves while [HSD is] not."); *id.* ("Given the information asymmetry involved in

the current case, as well as [HSD's] expertise in administration of the New Mexico

Medicaid program, the Court finds a flexible preliminary injunction to be both

permissible and appropriate in this case."). That is, HSD knew what steps it had

taken in the past to recruit additional nurses into the system, which of those steps had

been successful or unsuccessful, how the nursing workforce was currently deployed,

and how deployments could potentially be altered to provide necessary PDN hours to

M.G. and C.V. without depriving services to other Medicaid beneficiaries. "Courts

have recognized . . . issuance of a nonspecific injunction . . . may be justified . . .

when the information needed to make the order specific in form is known only to the

---

was too vague, *O.B.* concluded "the order granting the injunction gave reasons for it, stated its terms, and described in reasonable detail the acts required by the state, and thus complied with" Rule 65(d). *Id.* (quotations and alteration omitted). Furthermore, *O.B.* held that the injunction's mandate to "take prompt measures to obtain home nursing for the class members" was "a reasonably clear directive." *Id.* Finally, *O.B.* rejected the assertion the injunction mandated "affirmative steps to provide in-home nursing care, without identifying those steps." *Id.* at 842. Instead, it concluded the state agency "surely . . . knows what those 'affirmative steps' are—that is implicit in its claim to have taken many steps already." *Id.*

party to be enjoined." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2955 (3d ed. June 2024 Update).

Under the facts of this case, the district court was not required to pre-determine every act required to be performed by HSD to ensure M.G. and C.V. are not subjected to further irreparable harm during the pendency of this matter. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243-44 (10th Cir. 2001). The district court's preliminary injunction sufficiently identifies the actions HSD is required to undertake and guides the court in any potential review of HSD's compliance or noncompliance with its terms. *Id.* at 1243. This is especially true given the injunction's preliminary nature. *Id.* at 1244 (citing *Johnson v. Radford*, 449 F.2d 115, 117 (5th Cir. 1971) for the following proposition: "A temporary injunction is intended to be temporary, to meet the exigencies of the situation, and necessarily at times lacks the degree of precision which may be required on final decree.").

## C. Impact of *Armstrong*

In *Armstrong*, providers of "habilitation services," *see* 42 U.S.C. § 1396n(c), sued state officials "claiming that Idaho violates [42 U.S.C. § 1396a(a)(30)(A)] by reimbursing providers of habilitation services at rates lower than [§ 1396a(a)(30)(A)] permits." 575 U.S. at 323-24. The district court ruled in favor of the providers and the Ninth Circuit affirmed. *Id.* at 324. In so doing, the Ninth Circuit "said that the providers had an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Id.* (quotation omitted). The Supreme Court reversed. *Id.* at 332. The Court first rejected

38

the notion the Supremacy Clause creates a cause of action. *Id.* at 324-27. It then moved on to consider whether, "quite apart from any cause of action conferred by the Supremacy Clause, [the] suit [could] proceed against Idaho in equity." *Id.* at 327. The Court answered the question in the negative based on the necessary confluence of two factors: (1) the availability of an administrative remedy in the nature of the withholding of Medicaid funds from Idaho by the Secretary of Health and Human Services and (2) the "judicially unadministrable nature of [§ 1396a(a)(30)'s] text." *Id.* at 327-29.[24]

Four members of the *Armstrong* Court would have gone further and addressed an issue not raised by the providers: whether the providers could proceed under the Medicare Act itself. *Id.* at 331 ("The last possible source of a cause of action for respondents is the Medicaid Act itself. They do not claim that, and rightly so."). Those four members would have held the habilitation-service providers could not proceed directly under § 1396a(a)(30)(A) because the act is Spending Clause legislation, the provision of benefits under such legislation does not generally create a private right of action, and "[n]othing in the Medicaid Act suggests that Congress

---

[24] Section 1396a(a)(30) mandates that state Medicare plans set rates for payment

> as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

meant to change that for the commitments made under [§ 1396a(a)(30)(A)]." *Id.* at 331-32. Justice Breyer, the fifth vote for the other portions of the majority opinion, refused to join the discussion of the impact of the Medicaid Act being Spending Clause legislation. *Id.* at 333 (Breyer, J., concurring in part & concurring in the judgment). Instead, according to Justice Breyer, the answer to the question whether it is appropriate to grant injunctive relief against state officers who are violating federal law "does not follow from the application of a simple, fixed legal formula separating federal statutes that may underlie this kind of injunctive action from those that may not. The statute books are too many, the laws too diverse, and their purposes too complex, for any single legal formula to offer courts more than general guidance." *Id.* (quotations and alteration omitted). "Rather," Justice Breyer "believe[d]," "several characteristics *of the federal statute before* [*the Court*], when taken together, make clear that Congress intended to foreclose respondents from bringing *this particular action for injunctive relief*." *Id.* (emphasis added).

As it did before the district court, HSD argues on appeal that *Armstrong* forecloses M.G.'s and C.V.'s request for injunctive relief. The district court rejected this argument because M.G. and C.V. were not proceeding pursuant to § 1396a(a)(30)(A) and were not asking it to undertake a review of HSD's reimbursement rates. Instead, the district court concluded M.G. and C.V. were seeking only the medical services they were entitled to receive under the EPSDT provisions of the Medicaid Act and "the briefing of both sides includes numerous other options to attempt in good faith to meet [HSD's] obligations" under the Act.

40

Dist. Ct. Order at 26. Ultimately, the district court concluded that state of affairs "belie[d] [HSD's] argument that [M.G. and C.V.] have not identified any way HSD has failed to meet its alleged obligations with respect to furnishing PDN services other than failing to increase reimbursement rates." *Id.* (quotation omitted).

The district court did not err, clearly or otherwise, in concluding *Armstrong* has no application to this case because M.G. and C.V. are not, directly or surreptitiously, seeking to engage the district court in ratemaking pursuant to § 1396a(a)(30)(A). They did not seek, and the district court did not grant, an increase in the rate HSD pays any person or entity.[25] To the extent HSD is arguing *Armstrong* stands for the proposition that a suit by a Medicaid beneficiary that might tangentially cause it to raise rates to provide services mandated by the Act is foreclosed, its argument is inconsistent with the holding in *Armstrong* as described above. The argument is also inconsistent with this court's decision in *Planned Parenthood of Kansas*, 882 F.3d at 1226, which refused to give *Armstrong* such an expansive reading. Finally, it is unsupported by citation to even a single precedent. And, to be clear, numerous courts have refused to give *Armstrong* the breathtaking sweep HSD seeks to attribute to it. *See, e.g., N.Y. State Citizens' Coal. for Children*

---

[25] Indeed, HSD has not explained how § 1396(a)(30)(A) operates in New Mexico's managed-care system, as opposed to the fee-for-service system at issue in *Armstrong*. *See generally St. Anthony Hosp. v. Whitehorn*, 100 F.4th 767, 774 (7th Cir. 2024) (discussing the differences between fee-for-service and managed-care systems and noting fee-for-service systems are regulated by §1396a(a)(30)(A), while managed-care systems are regulated by 42 U.S.C. § 1396u-2), *vacated & ordered to be reheard en banc*, No. 21-2325, 2024 WL 3561942, at *1 (7th Cir. July, 24, 2024).

*v. Poole*, 922 F.3d 69, 84-85 (2d Cir. 2019); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 446-48 (6th Cir. 2020). After all, if *Armstrong* intended to mandate such a rule, it would say so. In any event, Justice Breyer's separate opinion specifically rejected the notion such a rule exists or should exist. On that front, as set out above, the district court applied the rubric set out in *Planned Parenthood of Kansas* and concluded the EPSDT provisions of the Medicaid Act created a private right. *See supra* n.9. HSD has not appealed that ruling. This court rejects as legally unsound HSD's suggestion that *Armstrong* precludes any suit based on the Medicaid Act's EPSDT provisions even if there is the remotest possibility HSD will have to expend funds or raise rates to provide the mandated services.

## V. CONCLUSION

For those reasons set out above, the preliminary injunction issued by the United States District Court for the District of New Mexico is hereby **AFFIRMED**.